USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1108

 EDWARD E. LOMBARD, ASA P. LOMBARD, III,
 EDITH LOMBARD CASSICK, RUTH LOMBARD GOURLEY,
 FLORENCE LOMBARD BROWN, BARBARA LOMBARD BANUK,
 SUSAN LOMBARD BLACK, ALTON HORTE, BARBARA BAINES,
 VIRGINIA H. HART, CARLETON G. SMITH,

 Plaintiffs, Appellants,

 ROBERT D. LOMBARD, FRANKLAND W.L. MILES, JR.,
 JOHN GROTHER MILES, TAGALIE L. LOMBARD,

 Appellants,

 v.

 UNITED STATES OF AMERICA,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]

 Before

 Boudin, Circuit Judge
 Bownes, Senior Circuit Judge,
 and Stahl, Circuit Judge.
 
 
 
 John D. Hallisey for appellants Edward E. Lombard, et al.
 David S. Mackey, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for the
United States.

October 26, 1999

 
 
 BOUDIN, Circuit Judge. This appeal arises out of a title
dispute between a family and the United States over an 8.6 acre
parcel, known as the Lombard lot, containing within it a family
cemetery and located in the Bound Brook Island area of Wellfleet,
Cape Cod, Massachusetts. The lot was once owned by Thomas Lombard,
who died in 1873, leaving it to his five children as tenants in
common. Then, in 1924, two of the children conveyed their
interests to one George Higgins, possibly saying that they owned
the entire parcel. In all events, George Higgins thereafter
claimed ownership of the entire parcel and not just of the 40
percent that the two children had actually owned.
 In 1935, Higgins petitioned the Massachusetts Land Court
to register and confirm his sole title to nearly 150 acres of land
in the Bound Brook Island area, including the 8.6 acre Lombard lot. 
One of Thomas Lombard's grandsons appeared in the suit, claiming an
interest, and at Higgins's request, the suit so far as it pertained
to the Lombard lot was severed from the rest. The court then
confirmed Higgins's title to the other land, but the severed case
involving the Lombard lot remained dormant until 1958, when it was
ordered dismissed without prejudice; through apparent error, the
dismissal order was not properly docketed and, in 1976, the land
court sua sponte docketed an order dismissing the severed case for
lack of prosecution.
 In the meantime, in the 1960s the United States
established the Cape Cod National Seashore by acquiring large
amounts of land in Wellfleet and neighboring communities. In 1962,
Higgins agreed to sell the Lombard lot to the United States--all of
it, not just a 40 percent interest--and the deed was recorded in
the Barnstable County Registry of Deeds on December 31, 1962.
However, the government was aware of potential claims by Lombard
descendants--the title search report incident to the sale so
indicated--and by agreement with Higgins, it withheld the purchase
price for the Lombard lot (apparently $13,500) so that Higgins
could clear up the defect.
 This Higgins sought to do by a quiet title action,
brought in October 1963 in the Barnstable County Superior Court,
naming as defendants among others the heirs of Thomas Lombard. 
Service was made by publication, and a deputy sheriff certified
that despite a diligent search he had found none of the heirs
within his precinct. A guardian ad litem, appointed to represent
the heirs, supported Higgins's assertion that he had acquired full
title by a combination of adverse possession and the deed from two
of Thomas Lombard's children. In August 1964, the court confirmed
Higgins's title, subject to the Lombard family's ownership of the
cemetery and an easement to visit it.
 In April 1997, eight descendants of Thomas Lombard
brought the present lawsuit against the United States in the
federal district court in Massachusetts under the partition
statute, 28 U.S.C. 2409. The plaintiffs, claiming through two of
the three children of Thomas Lombard who had not conveyed their
interests to Higgins, asserted that the Lombard descendants still
owned 60 percent of the Lombard lot as tenants in common with the
United States, and sought to partition their interest. The
government, in addition to asserting title based on the 1964
decree, argued that the partition statute did not extend to suits
in which title was disputed.
 Discovery ensued as to what various Lombard descendants
knew at different times about title to the Lombard lot and related
matters. The United States then moved for dismissal or summary
judgment, and the plaintiffs countered with a motion for summary
judgment to recognize their title and later a motion to amend the
complaint to assert a claim under the Quiet Title Act, 28 U.S.C. 
2409a; this is a later-enacted companion to the partition statute
that permits a quiet title action against the United States,
provided it is brought within twelve years of the date that "the
plaintiff or his predecessor in interest knew or should have known
of the claim of the United States." Id. 2409a(g).
 In November 1998, the district court granted the
government's motion for summary judgment as to the partition
statute claim, denied the plaintiffs' motion for summary judgment
as to title, denied as futile the plaintiffs' motion for leave to
amend, and entered final judgment for the United States. Lombard
v. United States, 28 F. Supp. 2d 44, 50 (D. Mass. 1998). The court
ruled that the partition statute authorized division only of
undisputed interests in common and did not permit the court to
resolve title disputes. As for the plaintiffs' motion to amend to
assert a quiet title claim under the Quiet Title Act, the court
held that the amendment would be futile because the claims of the
plaintiffs, and several additional heirs who had intervened, were
barred by the twelve-year statute of limitations governing section
2409a. This appeal followed.
 Two circuits have held, consistent with the district
court's view, that the partition statute does not allow claims by
a citizen whose title is disputed. See Stubbs v. United States,
620 F.2d 775, 782 (10th Cir. 1980); Rambo v. United States, 145
F.2d 670, 671 (5th Cir. 1944), cert. denied, 324 U.S. 848 (1945). 
Rambo, the only decision that offers much analysis, 145 F.2d at
671, reasoned that, historically, partition actions did not resolve
title disputes; that waivers of sovereign immunity are strictly
construed; and that (as of 1944) the United States had not
consented to suits against it to resolve title disputes as to
property it purported to own. 145 F.2d at 671. 
 Of course, the last of these concerns was eliminated in
1972 when Congress adopted the Quiet Title Act, explicitly
authorizing quiet title actions against the United States and
thereby waiving sovereign immunity as to such claims. See Act of
Oct. 25, 1972, Pub. L. No. 92-562, 3(a), 86 Stat. 1176 (codified
as amended at 28 U.S.C. 2409a). Conversely, even if we were to
read the partition statute now to embrace cases of disputed title,
we could hardly ignore the explicit twelve-year statute of
limitations on quiet title disputes. See 28 U.S.C. 2409a(g). 
The rationale for limiting the partition statute to undisputed
titles may have vanished in 1972, but any effort to read the two
statutes in light of each other works both ways: if the partition
statute allows the court to resolve incidental title disputes (a
point we need not decide), it is so only if the suit is brought
within the twelve year limitations period.
 This brings us to the statute of limitations issue. 
Formally, the district court merely denied the plaintiffs' motion
to amend, which the government claims is a step reviewed solely for
"abuse of discretion." This would be so if the district court had
said that the amendment came too late based on concerns about case
management. See Credit Francais Int'l v. Bio-Vita, 78 F.3d 698,
704 n.9 (1st Cir. 1996). But as we read the district court's
decision, it rests squarely on a finding that the amendment would
be futile because the plaintiffs' quiet title claim is barred by
the statute of limitations, a finding that it supports with a
detailed discussion of the facts.
 If the same Lombard plaintiffs now brought a new action
under the quiet title statute, the United States would assert that
the district court's finding was res judicata on the limitations
issue. Thus, we treat the district court decision just as if the
district court had granted the motion to amend and then dismissed
the new claim on the ground that the statute of limitations had
run. See Jones v. New York State Division of Military and Naval
Affairs, 166 F.3d 45, 49 (2d Cir. 1999); Fisher v. Roberts, 125
F.3d 974, 977 (6th Cir. 1997). Ordinarily, a grant of summary
dismissal invites de novo review on appeal. See Cadle Co. v.
Hayes, 116 F.3d 957, 960 (1st Cir. 1997).
 The district court ruled that the Lombard heirs had
enough information to alert them over twelve years ago to the
government's adverse claim to the Lombard lot and--this is a
somewhat different point--that many of the plaintiffs acknowledged
by their admissions and actions that they thought that they had no
interest in the property. Specifically, the district court found
the following as to some, or all, of the plaintiffs:
 That "most of the plaintiffs have
 believed for decades that David Lombard had
 stolen [the Lombard lot] . . . and sold it to
 Higgins" and "[i]n light of the widespread
 family knowledge of the sale [to Higgins] over
 such a long period of time, they could easily
 have learned the status of the property by
 making inquiry";

 That some of the plaintiffs recalled
 learning of the Cape Cod National Seashore in
 the 1960s, and that "most knew that the United
 States had acquired the Brook Bound (sic)
 Island property for that purpose [the Cape Cod
 National Seashore]"; and 

 That the plaintiffs did not pay
 property taxes on the land surrounding the
 cemetery, did not maintain that land, did not
 occupy it and did not assert ownership to the
 National Park Service or the Town of
 Wellfleet, but at most "occasionally visited
 the family cemetery, picked blueberries, and
 had picnics on the adjacent property."
Lombard, 28 F. Supp.2d at 49.
 The district court's finding that as early as the 1960s,
"most [of the plaintiffs] knew that the United States had acquired
the Brook Bound (sic) Island property for that purpose," could be
taken as a reference to the Lombard lot itself. If so read and
adequately supported in the record, this would resolve this case in
favor of the United States: it would mean that such plaintiffs had
actual knowledge of the government's claim to the Lombard lot as
far back as the 1960s. Yet we cannot find any unambiguous record
evidence that any of the plaintiffs knew prior to this suit that
the government had acquired the Lombard lot or any interest in it.
 Ample evidence in the record shows that some plaintiffs
knew that the government was purchasing property on Cape Cod for
the purpose of creating the National Seashore. There is even some
indication that individual plaintiffs had sold other property to
the government for this purpose, although it is unclear whether
this property was in the Bound Brook Island area. In all
likelihood, the district court's quoted finding meant only that the
plaintiffs knew that the government was buying property for the
National Seashore in Wellfleet, including property in the Bound
Brook Island area.
 Of course, the statute of limitations does not require
actual knowledge of the government's claim. If other facts known
twelve or more years before this action was brought would have
prompted a reasonable landowner to make further inquiries, which in
turn would have led to knowledge of the government's claim, then
the statute bars the owner because he "should have known" of the
government's claim. And had the plaintiffs' suspicions been
aroused, the government's claim would have been easy to discover,
either by asking national seashore officials or looking at the
title records at the Barnstable registry.
 But what events fairly charged the plaintiffs with
reasonable suspicions requiring further inquiry? Merely to say
that the government was buying land somewhere in Wellfleet or the
Bound Brook Island area for its national park is hardly enough, and
there is little to show the location of government land purchases
known to individual plaintiffs. About the most one can say is that
this background knowledge of purchases in the area might have added
to suspicions of a government claim to the Lombard lot if there
were other, more specific indications suggesting that the
government was claiming ownership of the Lombard lot. 
 Elsewhere in the opinion the district court noted that
the government had erected a locked gate somewhere on the road to
the family cemetery, see Lombard, 28 F. Supp.2d at 49-50, and there
is also an indication in the record that at some point trees grew
up around the road making it difficult for cars to pass. At least
some of the plaintiffs knew that the gate was under the
government's control; one of the plaintiffs had complained and the
government had provided a key to the gate, although it did not
remove the barrier. We agree that, if the government puts a gate
at the entrance to your property, this is ordinarily sufficient
notice to warrant inquiry. Cf. Park County, Montana, 626 F.2d at
721 n.6; Grosz, 556 F.2d at 975; Howell, 519 F. Supp. at 304-06.
 The plaintiffs argue that any knowledge that the
government was exercising some proprietorship over the Lombard lot
would have been consistent with a belief that the government owned
40 percent and would not suggest that the government was claiming
ownership of the 60 percent interest now claimed by the Lombard
heirs. Perhaps so if the plaintiffs knew that a 40 percent
ownership interest had been claimed by Higgins and that the
government had been dealing with him to acquire his interest. But
none of the plaintiffs claim to have known anything about the sale
by Higgins to the government of his Lombard lot interest.
 The more serious problem with the gate argument is that
nothing in the testimony or crude maps in the record indicates to
us precisely where the gate was placed in relation to the property
line of the Lombard lot. For example, if the gate was just at the
property line of the Lombard lot, this might support an inference
that the government was claiming ownership of the lot. But if the
gate were on a portion of the road leading to the Lombard lot but
not yet actually within the lot, it might have been put there
simply to limit access to other government property through which
the road ran before reaching the Lombard lot. In that event, it
would not necessarily suggest that the government was claiming
ownership of the lot itself, and providing a key to the gate would
be consistent with recognizing an easement over the road to reach
the Lombard lot, cf. Schultz v. Department of Army, 886 F.2d 1157,
1159-61 & n.2 (9th Cir. 1989).
 It is worth adding that the district court's opinion did
not rely at all on the gate in giving its reasons why the claim was
barred. The gate was mentioned only briefly in setting out the
facts. See Lombard, 28 F. Supp.2d at 49-50. The government refers
to it merely as part of a bouillabaisse description of all of the
possible facts that it thinks in any way support an inference of
knowledge or suspicion. Only with more detailed and specific
findings by the district court could the gate help to show that the
plaintiffs "should have known" of a government claim to own the
Lombard lot.
 The district court pointed to two other sets of facts:
that a number of plaintiffs thought that the Lombard lot had been
stolen by Higgins long ago and that the heirs did not pay property
taxes, maintain the lot, live there, assert ownership, or visit it
except occasionally. See Lombard, 28 F. Supp.2d at 49. There is
not much information about taxation rates and enforcement but, this
aside, we agree with the district court that these facts support an
inference that for some years the plaintiffs might well have
thought that they had no claim at all to the Lombard lot. Rising
property prices, it may be supposed, have now prompted a closer
look.
 If we were concerned with laches or other equitable
limitations, all this might be grist for the mill. But the statute
of limitations in this case is triggered only if the plaintiffs
knew or should have known of the government's claim, compare United
States v. Beggerly, 118 S. Ct. 1862, 1868 (1998); that for other
reasons they may have doubted their own title is beside the point
unless this fact fits into a set of inferences suggesting that they
believed or should have believed that the government claimed title. 
This might well be the case if they had known of Higgins's sale to
the government, but the record is at best uncertain on this point.
 One might ask why it matters whether the plaintiffs knew
of the government's claim or merely lacked faith in their own. The
answer is that an owner does not normally forfeit his ownership of
real property through ignorance of his title, unless adverse
possession is established (and that requires a showing of notorious
possession and often for more than twelve years). See, e.g., Eno
& Hovey, 28 Massachusetts Practice 27.1, at 560-62 (3d ed. 1995). 
In waiving sovereign immunity to quiet title actions against it,
the government established a special limitations period favorable
to itself, but only where the property ownership knew or should
have known that the government claimed ownership (and then failed
to dispute it within the period).
 Thus far, we have treated the plaintiffs as a group and
made reference to the district court's findings of what "most" or
"many" of the plaintiffs knew. Strictly speaking, the Quiet Title
Act, subject to certain qualifications, requires that each
plaintiff's claim be assessed individually, meaning that some may
lose their claims while others may not, depending on individual
knowledge. See, e.g., Klugh v. United States, 818 F.2d 294, 299
(4th Cir. 1987). The district court made some effort to
distinguish among groups of heirs based on their level of
knowledge.
 If the parties did not object to composite plaintiffs or
treatment of them collectively by group, this might be a reasonable
approach for litigation, adopted by implicit agreement. Here,
claimed shares of individual plaintiffs are rather minute (they
appear in this case to range from 1/15 to 1/300); and an heir-by-
heir analysis might well be costly and productive of only minute
victories. We mention the issue only to avoid any implicit
endorsement of the composite or grouping approach as a general
construction of the statute.
 We turn now to plaintiffs' further claim that they were
entitled to judgment in their favor on the issue of title. Their
argument is that the 1976 dismissal of Higgins's original "severed
case," in which he sought to acquire from the state land court a
declaration of full ownership over the lot, was a dismissal "with
prejudice" under state law; that this dismissal therefore
determined that Higgins owned only 40 percent of the Lombard lot
and the heirs owned the remainder; and that the federal district
court was required under the Full Faith and Credit Statute, 28
U.S.C. 1738, to accept this determination as binding in the
present action against the United States.
 Because the original 1958 order of the land court made
clear that the dismissal of the severed action was intended to be
without prejudice, it would not normally result in claim
preclusion, see Restatement (Second) of Judgments 20 (1982), and
since no facts were actually resolved in the case at all, there
cannot be issue preclusion under ordinary doctrine. See id. 27. 
Still, plaintiffs say that Mass. Gen. Laws ch. 185, 44 (1998)
requires a different conclusion because the 1976 cleanup order did
not say expressly that it was without prejudice. The statute
reads:
 If the court finds that the plaintiff has not
 title proper for registration, a judgment
 shall be entered dismissing the complaint, and
 such judgment may be ordered to be without
 prejudice, in whole or in part, but unless so
 ordered it shall bind the parties, their
 privies and the land in respect of any issue
 of fact which has been tried and determined.

 Even if we assume that section 44 applies--which is
unclear--the most one could say is that section 44 might then
treat a judgment of dismissal, where silent, as "bind[ing] the
parties, their privies and the land in respect of any issue of fact
which has been tried and determined." Id. (emphasis added). But
no issue of fact was tried and determined in the severed case. At
most a dismissal with prejudice might mean that Higgins could not
bring the same action again.
 The plaintiffs also rely on McCarthy v. Town of Oak
Bluffs, 643 N.E.2d 1015 (Mass. 1994). There, as here, a
registration case in the land court was thereafter severed into
two--one for property claimed east of a specific mean low water
line and the other for land west of the line. See 643 N.E.2d at
1018. The former case was pursued and resulted in a decree of
registration in 1960; the latter was dismissed in 1977 for lack of
prosecution. See id. Thereafter, privies of the plaintiffs
brought a new suit asserting title to the western portion, the
subject of the dismissed suit, and the court held that the new suit
could not be brought. See id. at 1019.
 But the court's reasons destroy the parallel with the
present case. The land court held in the new suit that the earlier
one had made a factual determination of the western boundary of the
property; and it was this finding to which the court gave
preclusive effect. See id. at 1018-19, 1021. Further, it found
that the original plaintiffs had signed a stipulation stating that
they had no interest in land westward of the line, that licenses
they had taken confirmed that concession, and that state law made
it illegal for them to own land westward of the line. See id. at
1018-19. Thus McCarthy is not on point.
 To sum up, we conclude that the rejection of the proposed
amendment to the complaint cannot on this record be supported on
the ground given for the denial. However, the plaintiffs' full
faith and credit argument is without merit and to prevail
ultimately, the plaintiffs would have to avoid the 1964 quiet title
judgment and defeat a likely claim by the government that Higgins
had obtained full title to the Lombard lot by adverse possession. 
And if title to fractional interests were established by
plaintiffs, problems of remedy would remain.
 Such issues could be costly and time consuming to
litigate on both sides. And, while the government's hands are not
perfectly clean (given its actual knowledge of Higgins's doubtful
paper title to the whole), the plaintiffs are in some measure
seeking a windfall from property widely thought to have been lost
long ago by the family. All this suggests that both sides might be
well advised to renew their earlier, unsuccessful efforts to settle
the case.
 The judgment of the district court is vacated and the
case is remanded for further proceedings consistent with this
opinion. Our judgment reinstates the partition statute claim
merely as a contingent remedy available if and when the plaintiffs
can establish ownership under the Quiet Title Act by satisfying the
statute of limitations and all other prerequisites. Nothing in our
decision precludes a further motion for summary judgment by the
government on statute of limitations grounds (assuming a more
developed record) or any other ground available to it.
 It is so ordered.