Dr. William Harvey **HOWELL**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. A. No. C80–159R.

United States District Court,
N. D. Georgia,
Rome Division.

June 26, 1981.

Frank D. Smith, Jr., Shepherd L. Howell, Cartersville, Ga., for plaintiff.

Jere W. Morehead, Asst. U. S. Atty., Atlanta, Ga., for defendant.

## ORDER

HAROLD L. MURPHY, District Judge.

### JURISDICTION

Jurisdiction of this Court is based upon 28 U.S.C. § 1346(f) which grants District Courts exclusive original jurisdiction of civil actions under 28 U.S.C. § 2409a involving actions to quiet title to real property in which an interest is claimed by the United States.

### STATEMENT OF THE CASE

The defendant, United States of America, through the United States Department of Agriculture, Forest Service, caused a survey to be done of the boundary lines of Land Lot Nos. 167, 174, 175 and 176 of the 5th District, 1st Section of Lumpkin County, Georgia, the original lines of these land lots constituting boundary lines between plaintiff and defendant. Plaintiff disagrees with the boundary lines, as claimed by defendant, maintains that they are incorrect and do not follow the original lines as traced in the original 1832 survey of the district of which these land lots are a part. Plaintiff contends that he and his predecessors in title have exercised dominion and control over certain fields and creeks within the area claimed by the Forest Service based on the results of their surveys.

Plaintiff maintains that defendant has failed, or has negligently neglected to properly follow the original 1832 survey of the boundary lines in dispute. This includes a failure to recognize established corners and trees bearing line marks.

Plaintiff's suit is based on actions of defendant that have caused a "cloud on the title" over the specific property within the disputed boundary lines.

Plaintiff in his complaint contends that the United States of America is liable because the actions were taken by employees of the United States Forest Service, a division of the United States Department of Agriculture, which is a governmental unit of the United States of America.

Plaintiff claimed damage in his complaint based on the claim of the defendant to specific properties within the disputed boundary lines.

This Court dismissed plaintiff's claim for monetary damages by Order dated February 19, 1981. The United States contends that the remaining quiet title aspects of this action are barred under 28 U.S.C. § 2409a(f), since this action was not commenced within twelve years from the date plaintiff knew or should have known of defendant's claim to the disputed area.

It is the contention of the United States that the true and correct dividing lines between the land owned by plaintiff and the land owned by the United States are the boundary lines located at the time of the acquisition survey by the Forest Service in 1927–1929. In support of this contention, the United States contends the Forest Service acquisition surveys of 1927–1929 retraced the original 1832 survey. The lines or corners recovered or re-established by the 1927–1929 surveys are the basis of the boundary descriptions by which the United States acquired its lands and are the same lines and corners that the Forest Service has maintained as its boundaries from the time of acquisition to the present.

This action was tried by this Court without a jury on June 1, and 2, 1981. After hearing the testimony, reviewing the evidence and considering the argument of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff purchased Land Lot Nos. 167, 174, 175 and at least a part of 176 of the 5th District, 1st Section of Lumpkin County, Georgia, on February 29, 1956. Defendant has acquired title to Land Lots 168, 173, 236, 235, 234 and a portion of 233, adjoining lands common to the boundary lines of plaintiff.

2. Boundary lines of said lots were established by the original survey of 1832.

3. In 1969 defendant caused a survey to be done regarding the dividing boundary lines between the lands described above.

4. Mark Kendall was a common predecessor in title to all of the plaintiff's land and the vast portion of the United States' adjoining land.

5. Theodore R. Carder was the plaintiff's immediate predecessor in title.

6. Between 1927–29, during the time surrounding the government's acquisition of its land, the Forest Service conducted acquisition surveys in this area and in the area surrounding this property.

7. The surveys were conducted through the lots of the common predecessor in title, Mark Kendall and other properties.

8. During the period of Theodore Carder's ownership of the plaintiff's property, the Forest Service painted boundary lines in various areas surrounding his property. The painted lines were inconsistent with what he understood to be his property lines.

9. The painted lines placed by the Forest Service generally followed the corners and lines recovered or re-established in the 1927–29 acquisition surveys by the Forest Service.

10. While Mr. Carder did not agree with the location of the painted lines, he took no legal action because the Forest Service did not interfere with his use of the land. Mr. Carder farmed several fields lying within the portion of land claimed by the government. He argued with Forest Service employees when they warned him trees might be planted in some of the fields. He told them the trees would be plowed up.

11. At the time he sold his land to the plaintiff, Mr. Carder told the plaintiff he was only selling him land to the boundary lines as painted by the Forest Service. Although the plaintiff was aware of some problems with the Forest Service over the location of the boundary lines at the time of purchase as a result of having seen some of the painted lines he took no action until 1969 when he first contacted the Forest Service.

12. While the plaintiff also was told at the time of purchase that the property included all of the fields, a straight line connecting the painted trees in the woodland would have placed a portion of the fields within the area claimed by the government.

13. The United States' deeds call for and make reference to the corners as set on the ground by the acquisition surveys.

14. Through the present, plaintiff has maintained active possession of the fields in the areas of both the eastern and southern lines of his property by cultivation.

15. Plaintiff has maintained active possession of Jones Creek and its tributary branches in the area, by actions including building dams for trout pools. At least one of those dams contributed to erosion of a ditch through one of the fields following a heavy rainstorm.

16. There existed in the area of what plaintiff contends is the southeastern corner of Land Lot 174 a wooden stake with the numerals "174" inscribed thereon. This stake was located 115 feet south and 100 feet east of the point claimed by defendant to be the southeast corner of Land Lot 174. This stake is no longer in place. It was in an area disturbed by timber cutting done by defendant during the 1970's without the knowledge or consent of plaintiff.

17. The location of this missing stake is and has been considered to be at the southeast corner of Land Lot 174 by plaintiff, and by Theodore R. Carder, plaintiff's immediate predecessor in title.

18. There exists a chestnut oak tree that has been cut into showing numbers, located on what plaintiff contends is the south line of Land Lot 174.

19. There exists a cucumber tree (sometimes erroneously referred to as a "basswood tree") bearing some hack marks. This tree is hollow in the middle so that ancient marks cannot be recovered if any have ever been made in or on the tree.

20. There exists a white oak tree bearing hack marks which appear to have been made about 1900 to 1910 and which is located on what plaintiff contends is the south line of Land Lot 175.

21. The chestnut oak tree, the cucumber tree, and the white oak tree are and have been considered to be "line trees" at or, in the case of the cucumber tree, near the location of the southern line of plaintiff by plaintiff and by Theodore R. Carder.

22. The original boundaries of the land lots in question as defined by a survey in 1832 was by survey authorized by Georgia Laws approved December 21, 1830, and December 24, 1831, which laws are known as the Gold Lottery Laws.

23. The original plats of Land Lots 174, 175 and 176 for the 1832 survey show Jones Creek and its tributary branches to be located entirely north of the south lines of Land Lots 174 and 175, and north of that part of the south line of Land Lot 176 east of the western property line of plaintiff. (The western property line of plaintiff in that area is a tributary branch that runs northeasterly across the south line of Land Lot 176 according to the original plats).

24. Although the plaintiff apparently was shown or located certain wooden posts or marked trees, inconsistent with the corners and lines established by the acquisition surveys, none of this evidence tied back to the original survey, any other survey or other accepted corner or corners. The plaintiff has offered no evidence to determine when these trees were marked or when the posts were set except the estimated age of hack marks on the white oak.

25. In examining the land which is the subject of this dispute, the plaintiff's surveyor made no independent determination of where the true corners and lines are located. He was shown certain posts and trees by the plaintiff. He did not conduct a survey to determine whether they were boundary markings. The plaintiff has offered no other survey information to show that the lines he claims are true and correct.

26. The boundary lines as claimed by the government and the present location of some streams in the property are inconsistent with some of the distances described in the 1832 survey, as some of the distances in the 1832 survey were incorrect. The 1832 survey apparently used the streams only for descriptive purposes to assist landowners in locating their property and the location of streams was inaccurate.

27. The 1927–29 Forest Service acquisition surveys were predicated upon the recovery of original trees and lines from the 1832 survey that were subsequently used to form the foundation or pattern of the lines claimed by the government as true and correct.

28. Through extensive search and critical observation, these surveyors in 1927–1929 recovered trees that were marked in the original 1832 survey and identified them as being of the age or vintage at the time of their recovery as tied them to the points shown in the 1832 survey.

29. These experienced surveyors utilized the original notes and plats and applied the proper rules of survey to re-establish missing lot corners by accepted survey practices.

30. The acquisition surveyors did not rely entirely upon the bearings and distances as recited in the original field notes and plats. They also used the original corners found on lots in this area to replace the lost corners. The bearings and distances called for in the acquisition surveys are a result of the placement of lost corners by the proper rules of survey.

31. If the acquisition surveyors had relied entirely upon original distances called for in the 1832 surveys, the location of the boundary lines as placed upon the ground

would have been even more inconsistent with the plaintiff's claim. The plaintiff's southern boundary line would have been located approximately 134 feet further north of the line claimed by the Forest Service as true and correct.

32. The original survey of 1832 identified certain features in the area of this land along the survey lines that serve as witnesses to the lines they were establishing at that time. These witnesses took the form of trees as well as other natural features such as prominent streams.

33. A number of the trees established and identified by the original survey were still present and identified during the Forest Service acquisition surveys of 1927–1929. The acquisition surveyors in 1927–1929 depended heavily upon these trees in their determination of where to locate the corners when other evidence was lost or obliterated.

34. Although streams are referred to at specific locations within the original notes there are many inconsistencies between present stream locations and the original survey references. These inconsistencies are either the result of the change in stream locations or inaccurate data recorded by the original surveyor, or both. Regardless of the reason for the inconsistencies, and there is little evidence of change of stream location, the reliance upon streams as the controlling factor for re-establishing the Original Lot Lines is subordinate to the reliance upon trees bearing marks of the original survey.

35. The white oak tree and chestnut oak tree claimed by Dr. Howell as being on the true original line cannot be identified with the original survey. The marks within the white oak, and the age of the chestnut oak eliminate either tree from consideration as containing evidence of the original survey. The tree referred to by Dr. Howell as a white basswood has been identified by professional foresters as a cucumber tree. However, the marks on these trees do give support to plaintiff's position.

36. Dr. Howell has produced no plat or other record of survey, subsequent to the original survey, that would identify any of the trees, posts, or other features that he claims as representing the true land lot boundaries.

37. The 1927–1929 United States acquisition surveys did, in fact, follow the original 1832 survey. These lot lines identified or re-established by the acquisition surveys and subsequently marked and maintained by the Forest Service, are the true and correct Lot Lines as presently claimed by the United States.

38. Supporting the validity and accuracy of defendant's contention that the lines contended for by it and the accuracy of its position are 15 points recovered in the acquisition survey from the original 1832 survey which were identified at trial to be located in the surrounding area which are incorporated in this order in a map identified as "Appendix A."

39. The location of this white oak and the cucumber tree, relied upon in part by plaintiff, and the lines claimed by Dr. Howell, as well as the lines contended for the defendant are shown on the map which is incorporated in this order as "Appendix B."

40. The basic contention in this case is the true location of the original lot lines between the properties involved. Each party claims that the line contended for in support of his or its position is the location of the original lines as established by the original survey of the area in 1832.

41. The preponderance of the evidence shows the boundary lines as depicted and claimed by the United States are the true and correct boundary lines between the land owned by the plaintiff and the defendant.

42. The preponderance of the evidence shows that plaintiff and his immediate predecessor in title were or should have been aware of the claim of the United States as to the location of its land lines adjacent to the property now owned by plaintiff at least since 1956.

43. Plaintiff filed this action on July 29, 1980.

## CONCLUSIONS OF LAW

■■■ 1. Defendant contends this action is barred under 28 U.S.C. § 2409a(f) because it was not commenced within twelve years of the date upon which it accrued. § 2409a(f) provides:

> any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such acts shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

Under § 2409a(f) something less than a direct, unequivocal statement to the opposing party is sufficient to constitute a claim by the United States. The evidence shows that the plaintiff and at least his immediate predecessor in title, Mr. Carder, were aware that the Forest Service painted lines were inconsistent with what they understood to be their boundary lines. From the painted trees the plaintiff and his predecessor in title, Mr. Carder, at least should have known of the government's claim to the area now in dispute. *See King v. United States*, BC–74–139 (W.D.N.C. December 28, 1979); *Snake River Ranch v. United States*, 542 F.2d 555 (10th Cir. 1976); *Park County, Montana v. United States*, 454 F.Supp. 1 (D.Mont.1978).

The Fifth Circuit Court of Appeals has held that the painting of trees on boundary lines and corners may be sufficient earmarks of possession under Ga.Code Ann. § 85–403. *Pannell v. Continental Can Co.*, 554 F.2d 216 (5th Cir. 1977).

The record is clear that plaintiff was aware of the Government's claim by the painted lines at the time of his purchase in 1956. He was told by Mr. Carder that the Forest Service had painted lines and while plaintiff continued to exercise dominion over the open fields and a portion of Jones Creek, an extension of the lines painted by the Forest Service would clearly have crossed the open fields and included the Jones Creek area in which plaintiff did work on the creek and posted signs.

Plaintiff contends that in Georgia the making of a survey and marking the boundaries is insufficient to show possession. *Dillon v. Maddox*, 21 Ga. 113 (1857); *Poss v. Guy*, 212 Ga. 393, 93 S.E.2d 565 (1956). In *Dillon v. Maddox, supra*, the Court did say; "an entry, merely for resurvey, is neither an open, notorious nor continued possession, and is perfectly consistent with an acknowledgement of the better title of the other party. To bar the older title, there must be a possession, such an one as may indicate to the owner that there is an adverse claimant of his land. Passing through a tract of land, or around it, and marking trees, is no such possession. It is no disseizin." However, in *Dillon* the issue was adverse possession and the court's opinion was rendered on the question of the admissibility of a surveyor's plat as evidence of possession.

Upon the issue of notice Ga.Code Ann. § 37–116 provides; "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry might have led. Ignorance of a fact, due to negligence, shall be equivalent to knowledge in fixing the rights of the parties." Knowledge chargeable to a party, after he is put on notice, extends to such knowledge as diligent inquiry would have disclosed. *United States v. West*, 132 F.Supp. 934, 937 (1955).

In *Park County, Montana v. United States*, 454 F.Supp. 1 (D.Mont.1978), the Court held that a sign posted on the disputed land stating "Entering Absaroka Primitive Area—Motor Vehicles Prohibited—Gallatin National Forest" was sufficient notice of the government's interest in and claim to the disputed right-of-way to constitute a claim. Certainly, under the record in this case, the painting of all the boundary lines except within the area of open fields is adequate to have and did give notice to plaintiff and his predecessor in title, Mr.

Carder, of the extent, claim and interest of defendant in the land contained within the painted boundaries and the extensions thereof across open fields.

The Court concludes that plaintiff's claim to all the property in dispute is barred by 28 U.S.C. § 2409a.

■ 2. At the trial evidence was offered by plaintiff which would support a claim of adverse possession. The evidence plaintiff presented at trial never established fully when the adverse possession occurred or the nature, length of time, and extent of the possession. A common predecessor in title to the plaintiff and the defendant possessed nearly all of the land involved in this dispute at the time the plaintiff's evidence shows facts of adverse possession except plaintiff's possession of the open fields and Jones Creek. Shortly after the period of time the record might support a claim of adverse possession, the United States acquired its land. 28 U.S.C. § 2409a(g) prohibits a claim of adverse possession against the government:

> [N]othing in this Section shall be construed to permit suits against the United States based on adverse possession.

To the extent that a claim of adverse possession has been made, it must be denied.

However, to the extent that the record shows adverse possession by any previous owner and by plaintiff against the Government the Court has considered same in weighing the import and notice to plaintiff of the painted boundary lines maintained by the Government and upon the issue of whether or not plaintiff and his predecessor in title knew or should have known of the Government's claim.

3. An original line is "the one that was surveyed in marking of the lot by numbers, in the first or original survey." *Davis v. Guffey*, 196 Ga. 816, 27 S.E.2d 689 (1943). The boundary lines at issue in this case were established by the original survey of 1832. The parties hold title to their respective tracts of land and the issue is the location of the dividing lines separating the property of the parties on the south and east sides of the property of the plaintiff, Dr. Howell. Each party contends the line claimed by him or it to be the correct dividing line and that the line advocated by each party under the evidence in the case is the original line as placed by the 1832 survey.

Ga.Code Ann. § 85–1601 provides in all cases of disputed lines the following rules shall be respected and followed: Natural landmarks, being less liable to change, and not capable of counterfeit, shall be the most conclusive evidence: Ancient or genuine landmarks, such as corner station or marked trees, shall control the course and distance called for by the survey. If the corners are established, and the lines not marked, a straight line, as required by the plat, shall be run, but an established marked line, though crooked, shall not be overruled; courses and distances shall be resorted to in the absence of higher evidence.

In *Riley v. Griffin*, 16 Ga. 141 (1854), a case relied upon by both parties, it was held:

> And thus, it will be seen that courses and distances occupy the lowest grade, instead of the highest, in the scale of evidence, as to the identity of land.

> And it is reasonable that this should be so; for any natural object, when called for distinctly, and satisfactorily proved— and the more prominent and permanent the object, the more controlling as a locator—becomes a landmark not to be rejected, because the certainty which it affords, excludes the probability of mistake:

> While course and distance, depending, for their correctness, on a great variety of circumstances, are constantly liable to be incorrect. Difference in the instrument used, and in the care of Surveyors and their assistants, lead to different results.

■ Georgia law provides that in cases of disputed lines individuals appointed as

processioners may along with a county surveyor mark the lines anew and in such a case it is the duty of the processioners to fix and determine the boundaries, as they actually exist; and to that end, they shall run and mark anew those lines which can be taken as having been formerly located and established, and not undertake to locate them as they might think they should originally have been laid out. *Cosby v. Reid*, 21 Ga.App. 604, 94 S.E. 824 (1917).

Under Georgia law providing that processioners shall mark the line anew their methods of locating the line may be described as follows;

Muniments, that is, deeds or other written evidence of title, accompanied by diagrams or plats which might on paper locate the boundaries of land, will not by themselves be enough to mark a line by.

However, even though the course and extent of the line itself may not have been actually marked out upon the earth's surface, yet, if there should exist enough physically established corners or landmarks, the mere connecting of which by straight lines, or from which the projecting of the courses and distances shown by the plat would be enough to complete the boundary, it would be the duty of the processioners to ascertain, mark, and establish the same, respecting always the rights had under actual possession. *Cosby v. Reid, supra; Stripland v. Nalley*, 108 Ga.App. 311, 312, 132 S.E.2d 849 (1963).

The case before this Court is not one under the Georgia processioning law. However rules applicable for the location of a boundary line under such a proceeding were appropriately used by defendant in this case in relocating the lines of the original 1832 survey. It is also clear that under Georgia law the use of courses and distances in establishing the location of the lines is appropriate. Cf. *Riley v. Griffin, supra.*

Under Georgia law an unascertained or disputed boundary line between cotermi-

nous proprietors may be established by oral agreement, provided such agreement be accompanied by actual possession to the agreed line or is otherwise executed; or such line may be established by acquiescence for seven years, by acts or declarations of the adjoining landowners. Such acquiescence to be effective, must be the acts or declarations of both the adjoining landowners. Ga.Code Ann. § 85–1602; *Robertson v. Abernathy*, 192 Ga. 694, 697, 16 S.E.2d 584 (1941). If such a land line had ever been established it would have become the true line between the parties. The evidence does not show that such ever occurred in this case and no party has sought to show such an occurrence. However, the marks contended by plaintiff to show the original line may result from such agreement, acquiescence or even from an incorrect survey which relied upon the location of streams on the original plats as survey points.

The weight of the evidence presented on the true and correct location of the boundary lines between the parties as being the original line according to the survey of 1832 favors the United States. While the plaintiff's evidence showed diligence and an intelligent consideration of his findings as to marks, none of his evidence could be tied to any previous survey or original monument.

On the other hand the United States offered clear and convincing testimony from two surveyors and its documentary evidence that the 1927–29 Forest Service acquisition surveys found original evidence from the 1832 survey and used accepted survey procedures to locate lot corners and boundary lines, lines which the United States has always claimed to be correct.

ACCORDINGLY, all of plaintiff's prayers are denied, the lines are found to be as contended by the defendant, and judgment shall be entered in favor of the defendant, United States of America.

APPENDIX "A"