Edward E. LOMBARD, Asa P. Lombard, III, Edith Lombard Cassick, Ruth Lombard Gourley, Florence Lombard Brown, Barbara Lombard Banuk, Susan Lombard Black, Alton Horte, Barbara Baines, Virginia H. Hart, Carleton G. Smith, Plaintiffs, Appellants, Robert D. Lombard, Frankland W.L. Miles, Jr., John Grother Miles, Tagalie L. Lombard, Appellants,

v.

UNITED STATES of America, Defendant, Appellee.

No. 99–1108.

United States Court of Appeals, First Circuit.

Heard Sept. 10, 1999.

Decided Oct. 26, 1999.

John D. Hallisey for appellants Edward E. Lombard, et al.

David S. Mackey, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for the United States.

Before BOUDIN, Circuit Judge
BOWNES, Senior Circuit Judge, and
STAHL, Circuit Judge.

BOUDIN, Circuit Judge.

This appeal arises out of a title dispute between a family and the United States over an 8.6 acre parcel, known as the Lombard lot, containing within it a family cemetery and located in the Bound Brook Island area of Wellfleet, Cape Cod, Massachusetts. The lot was once owned by Thomas Lombard, who died in 1873, leaving it to his five children as tenants in common. Then, in 1924, two of the children conveyed their interests to one George Higgins, possibly saying that they owned the entire parcel. In all events, George Higgins thereafter claimed ownership of the entire parcel and not just of the

40 percent that the two children had actually owned.

In 1935, Higgins petitioned the Massachusetts Land Court to register and confirm his sole title to nearly 150 acres of land in the Bound Brook Island area, including the 8.6 acre Lombard lot. One of Thomas Lombard's grandsons appeared in the suit, claiming an interest, and at Higgins's request, the suit so far as it pertained to the Lombard lot was severed from the rest. The court then confirmed Higgins's title to the other land, but the severed case involving the Lombard lot remained dormant until 1958, when it was ordered dismissed without prejudice; through apparent error, the dismissal order was not properly docketed and, in 1976, the land court *sua sponte* docketed an order dismissing the severed case for lack of prosecution.

In the meantime, in the 1960s the United States established the Cape Cod National Seashore by acquiring large amounts of land in Wellfleet and neighboring communities. In 1962, Higgins agreed to sell the Lombard lot to the United States—all of it, not just a 40 percent interest—and the deed was recorded in the Barnstable County Registry of Deeds on December 31, 1962. However, the government was aware of potential claims by Lombard descendants—the title search report incident to the sale so indicated—and by agreement with Higgins, it withheld the purchase price for the Lombard lot (apparently $13,500) so that Higgins could clear up the defect.

This Higgins sought to do by a quiet title action, brought in October 1963 in the Barnstable County Superior Court, naming as defendants among others the heirs of Thomas Lombard. Service was made by publication, and a deputy sheriff certified that despite a diligent search he had found none of the heirs within his precinct. A guardian ad litem, appointed to represent the heirs, supported Higgins's assertion that he had acquired full title by a combination of adverse possession and the deed from two of Thomas Lombard's children. In August 1964, the court confirmed Higgins's title, subject to the Lombard family's ownership of the cemetery and an easement to visit it.[1]

In April 1997, eight descendants of Thomas Lombard brought the present lawsuit against the United States in the federal district court in Massachusetts under the partition statute, 28 U.S.C. § 2409. The plaintiffs, claiming through two of the three children of Thomas Lombard who had not conveyed their interests to Higgins, asserted that the Lombard descendants still owned 60 percent of the Lombard lot as tenants in common with the United States, and sought to partition their interest. The government, in addition to asserting title based on the 1964 decree, argued that the partition statute did not extend to suits in which title was disputed.

Discovery ensued as to what various Lombard descendants knew at different times about title to the Lombard lot and related matters. The United States then moved for dismissal or summary judgment, and the plaintiffs countered with a motion for summary judgment to recognize their title and later a motion to amend the complaint to assert a claim under the Quiet Title Act, 28 U.S.C. § 2409a; this is a later-enacted companion to the partition statute that permits a quiet title action against the United States, provided it is brought within twelve years of the date that "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." *Id.* § 2409a(g).

In November 1998, the district court granted the government's motion for summary judgment as to the partition statute

---

1.  A month later the United States paid for the property. George Higgins had died during the proceeding but his wife, Katherine, was substituted and received the payment from the government.

claim, denied the plaintiffs' motion for summary judgment as to title, denied as futile the plaintiffs' motion for leave to amend, and entered final judgment for the United States. *Lombard v. United States,* 28 F.Supp.2d 44, 50 (D.Mass.1998). The court ruled that the partition statute authorized division only of undisputed interests in common and did not permit the court to resolve title disputes. As for the plaintiffs' motion to amend to assert a quiet title claim under the Quiet Title Act, the court held that the amendment would be futile because the claims of the plaintiffs, and several additional heirs who had intervened, were barred by the twelve-year statute of limitations governing section 2409a. This appeal followed.

Two circuits have held, consistent with the district court's view, that the partition statute does not allow claims by a citizen whose title is disputed. *See Stubbs v. United States,* 620 F.2d 775, 782 (10th Cir.1980); *Rambo v. United States,* 145 F.2d 670, 671 (5th Cir.1944), *cert. denied,* 324 U.S. 848, 65 S.Ct. 685, 89 L.Ed. 1408 (1945). *Rambo,* the only decision that offers much analysis, 145 F.2d at 671, reasoned that, historically, partition actions did not resolve title disputes; that waivers of sovereign immunity are strictly construed; and that (as of 1944) the United States had not consented to suits against it to resolve title disputes as to property it purported to own. 145 F.2d at 671.

■ Of course, the last of these concerns was eliminated in 1972 when Congress adopted the Quiet Title Act, explicitly authorizing quiet title actions against the United States and thereby waiving sovereign immunity as to such claims. *See* Act of Oct. 25, 1972, Pub.L. No. 92–562, § 3(a), 86 Stat. 1176 (codified as amended at 28 U.S.C. § 2409a). Conversely, even if we were to read the partition statute now to embrace cases of disputed title, we could hardly ignore the explicit twelve-year statute of limitations on quiet title disputes. *See* 28 U.S.C. § 2409a(g). The rationale for limiting the partition statute to undisputed titles may have vanished in 1972, but any effort to read the two statutes in light of each other works both ways: if the partition statute allows the court to resolve incidental title disputes (a point we need not decide), it is so only if the suit is brought within the twelve year limitations period.

■ This brings us to the statute of limitations issue. Formally, the district court merely denied the plaintiffs' motion to amend, which the government claims is a step reviewed solely for "abuse of discretion." This would be so if the district court had said that the amendment came too late based on concerns about case management. *See Credit Francais Int'l v. Bio–Vita,* 78 F.3d 698, 704 n. 9 (1st Cir. 1996).[2] But as we read the district court's decision, it rests squarely on a finding that the amendment would be futile *because* the plaintiffs' quiet title claim is barred by the statute of limitations, a finding that it supports with a detailed discussion of the facts.

If the same Lombard plaintiffs now brought a *new* action under the quiet title statute, the United States would assert that the district court's finding was res judicata on the limitations issue. Thus, we treat the district court decision just as if the district court had granted the motion to amend and then dismissed the new claim on the ground that the statute of limitations had run. *See Jones v. New York State Division of Military and Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999); *Fisher v. Roberts,* 125 F.3d 974, 977 (6th Cir.1997). Ordinarily, a grant of summary dismissal invites *de novo* review on appeal.

2. It appears that the motion to amend was made with reasonable promptness after the government asserted that the partition statute did not reach disputed titles, and much of the discovery was in fact addressed to the statute of limitations issue. Moreover, the district court took care to separate out other proposed amendments by the plaintiffs, which it denied as untimely. *See Lombard,* 28 F.Supp.2d at 48.

*See Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

The district court ruled that the Lombard heirs had enough information to alert them over twelve years ago to the government's adverse claim to the Lombard lot and—this is a somewhat different point—that many of the plaintiffs acknowledged by their admissions and actions that they thought that they had no interest in the property. Specifically, the district court found the following as to some, or all, of the plaintiffs:

● That "most of the plaintiffs have believed for decades that David Lombard had stolen [the Lombard lot] ... and sold it to Higgins" and "[i]n light of the widespread family knowledge of the sale [to Higgins] over such a long period of time, they could easily have learned the status of the property by making inquiry";

● That some of the plaintiffs recalled learning of the Cape Cod National Seashore in the 1960s, and that "most knew that the United States had acquired the Brook Bound (sic) Island property for that purpose [the Cape Cod National Seashore]"; and

● That the plaintiffs did not pay property taxes on the land surrounding the cemetery, did not maintain that land, did not occupy it and did not assert ownership to the National Park Service or the Town of Wellfleet, but at most "occasionally visited the family cemetery, picked blueberries, and had picnics on the adjacent property."

*Lombard,* 28 F.Supp.2d at 49.

The district court's finding that as early as the 1960s, "most [of the plaintiffs] knew that the United States had acquired the Brook Bound (sic) Island property for that purpose," could be taken as a reference to the Lombard lot itself. If so read and adequately supported in the record, this would resolve this case in favor of the United States: it would mean that such plaintiffs had *actual* knowledge of the government's claim to the Lombard lot as far back as the 1960s. Yet we cannot find any unambiguous record evidence that any of the plaintiffs knew prior to this suit that the government had acquired the Lombard lot or any interest in it.

Ample evidence in the record shows that some plaintiffs knew that the government was purchasing property on *Cape Cod* for the purpose of creating the National Seashore. There is even some indication that individual plaintiffs had sold other property to the government for this purpose, although it is unclear whether this property was in the Bound Brook Island area. In all likelihood, the district court's quoted finding meant only that the plaintiffs knew that the government was buying property for the National Seashore in Wellfleet, including property in the Bound Brook Island area.

Of course, the statute of limitations does not require actual knowledge of the government's claim. If other facts known twelve or more years before this action was brought would have prompted a reasonable landowner to make further inquiries, which in turn would have led to knowledge of the government's claim, then the statute bars the owner because he "should have known" of the government's claim.[3] And had the plaintiffs' suspicions been aroused, the government's claim would have been easy to discover, either by asking national seashore officials or looking at the title records at the Barnstable registry.

But what events fairly charged the plaintiffs with reasonable suspicions requiring further inquiry? Merely to say that the government was buying land somewhere in Wellfleet or the Bound

---

**3.** *See, e.g., Park County, Montana v. United States,* 626 F.2d 718, 721 n. 6 (9th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981); *Grosz v. Andrus,* 556 F.2d 972, 975 (9th Cir.1977); *Howell v. United States,* 519 F.Supp. 298, 304–06 (N.D.Ga. 1981).

Brook Island area for its national park is hardly enough, and there is little to show the location of government land purchases known to individual plaintiffs. About the most one can say is that this background knowledge of purchases in the area might have added to suspicions of a government claim to the Lombard lot *if* there were other, more specific indications suggesting that the government was claiming ownership of the Lombard lot.

Elsewhere in the opinion the district court noted that the government had erected a locked gate somewhere on the road to the family cemetery, *see Lombard,* 28 F.Supp.2d at 49–50, and there is also an indication in the record that at some point trees grew up around the road making it difficult for cars to pass. At least some of the plaintiffs knew that the gate was under the government's control; one of the plaintiffs had complained and the government had provided a key to the gate, although it did not remove the barrier. We agree that, if the government puts a gate at the entrance to your property, this is ordinarily sufficient notice to warrant inquiry. *Cf. Park County, Montana,* 626 F.2d at 721 n. 6; *Grosz,* 556 F.2d at 975; *Howell,* 519 F.Supp. at 304–06.

The plaintiffs argue that any knowledge that the government was exercising some proprietorship over the Lombard lot would have been consistent with a belief that the government owned 40 percent and would not suggest that the government was claiming ownership of the 60 percent interest now claimed by the Lombard heirs. Perhaps so *if* the plaintiffs knew that a 40 percent ownership interest had been claimed by Higgins and that the government had been dealing with him to acquire his interest. But none of the plaintiffs claim to have known anything about the sale by Higgins to the government of his Lombard lot interest.[4]

The more serious problem with the gate argument is that nothing in the testimony or crude maps in the record indicates to us precisely where the gate was placed in relation to the property line of the Lombard lot. For example, if the gate was just at the property line of the Lombard lot, this might support an inference that the government was claiming ownership of the lot. But if the gate were on a portion of the road leading to the Lombard lot but not yet actually within the lot, it might have been put there simply to limit access to other government property through which the road ran before reaching the Lombard lot. In that event, it would not necessarily suggest that the government was claiming ownership of the lot itself, and providing a key to the gate would be consistent with recognizing an easement over the road to reach the Lombard lot, *cf. Shultz v. Department of Army,* 886 F.2d 1157, 1159–61 & n. 2 (9th Cir.1989).

It is worth adding that the district court's opinion did not rely at all on the gate in giving its *reasons* why the claim was barred. The gate was mentioned only briefly in setting out the facts. *See Lombard,* 28 F.Supp.2d at 49–50. The government refers to it merely as part of a bouillabaisse description of all of the possible facts that it thinks in any way support an inference of knowledge or suspicion. Only with more detailed and specific findings by the district court could the gate help to show that the plaintiffs "should have known" of a government claim to own the Lombard lot.

■ The district court pointed to two other sets of facts: that a number of plaintiffs thought that the Lombard lot had been stolen by Higgins long ago and that the heirs did not pay property taxes, maintain the lot, live there, assert ownership, or visit it except occasionally. *See Lombard,* 28 F.Supp.2d at 49. There is not much information about taxation rates and en-

---

4. To the extent that the plaintiffs did have knowledge of a sale by Higgins to the government, the inference that he had only sold a 40 percent interest might not be easy to reconcile with the family legend that the whole property had been stolen from the Lombards.

forcement but, this aside, we agree with the district court that these facts support an inference that for some years the plaintiffs might well have thought that they had no claim at all to the Lombard lot. Rising property prices, it may be supposed, have now prompted a closer look.

If we were concerned with laches or other equitable limitations, all this might be grist for the mill. But the statute of limitations in this case is triggered only if the plaintiffs knew or should have known of the *government's* claim, *compare United States v. Beggerly*, 524 U.S. 38, ——, 118 S.Ct. 1862, 1868, 141 L.Ed.2d 32 (1998); that for other reasons they may have doubted their own title is beside the point unless this fact fits into a set of inferences suggesting that they believed or should have believed that the government claimed title. This might well be the case if they had known of Higgins's sale to the government, but the record is at best uncertain on this point.

One might ask why it matters whether the plaintiffs knew of the government's claim or merely lacked faith in their own. The answer is that an owner does not normally forfeit his ownership of real property through ignorance of his title, unless adverse possession is established (and that requires a showing of notorious possession and often for more than twelve years). *See, e.g.,* Eno & Hovey, 28 Massachusetts Practice § 27.1, at 560–62 (3d ed.1995). In waiving sovereign immunity to quiet title actions against it, the government established a special limitations period favorable to itself, but only where the property owner knew or should have known that the *government* claimed ownership (and then failed to dispute it within the period).

Thus far, we have treated the plaintiffs as a group and made reference to the district court's findings of what "most" or "many" of the plaintiffs knew. Strictly speaking, the Quiet Title Act, subject to certain qualifications, requires that each plaintiff's claim be assessed individually, meaning that some may lose their claims while others may not, depending on individual knowledge. *See, e.g., Klugh v. United States,* 818 F.2d 294, 299 (4th Cir. 1987).[5] The district court made some effort to distinguish among groups of heirs based on their level of knowledge.

If the parties did not object to composite plaintiffs or treatment of them collectively by group, this might be a reasonable approach for litigation, adopted by implicit agreement. Here, claimed shares of individual plaintiffs are rather minute (they appear in this case to range from ⅟₄₅ to 1/300); and an heir-by-heir analysis might well be costly and productive of only minute victories. We mention the issue only to avoid any implicit endorsement of the composite or grouping approach as a general construction of the statute.

We turn now to plaintiffs' further claim that they were entitled to judgment in their favor on the issue of title. Their argument is that the 1976 dismissal of Higgins's original "severed case," in which he sought to acquire from the state land court a declaration of full ownership over the lot, was a dismissal "with prejudice" under state law; that this dismissal therefore determined that Higgins owned only 40 percent of the Lombard lot and the heirs owned the remainder; and that the federal district court was required under the Full Faith and Credit Statute, 28 U.S.C. § 1738, to accept this determination as binding in the present action against the United States.

---

**5.** The primary qualification to this rule is that if the plaintiff's predecessor in interest knew or should have known of the government's claim, then the plaintiff's claim is time-barred. *See* 28 U.S.C. § 2409a(g). And while knowledge of one plaintiff is not normally imputed to another, there is some indication in this case that heirs located in or near Cape Cod effectively acted over the years as agents on behalf of other heirs located in distant locations throughout the country, which may make it appropriate to impute the knowledge of the agent-heirs to the principal heirs. *Cf. Klugh,* 818 F.2d at 299–301.

Because the original 1958 order of the land court made clear that the dismissal of the severed action was intended to be without prejudice, it would not normally result in claim preclusion, *see Restatement (Second) of Judgments* § 20 (1982), and since no facts were actually resolved in the case at all, there cannot be issue preclusion under ordinary doctrine. *See id.* § 27. Still, plaintiffs say that Mass. Gen. Laws ch. 185, § 44 (1998) requires a different conclusion because the 1976 cleanup order did not say expressly that it was without prejudice. The statute reads:

> If the court finds that the plaintiff has not title proper for registration, a judgment shall be entered dismissing the complaint, and such judgment may be ordered to be without prejudice, in whole or in part, but unless so ordered it shall bind the parties, their privies and the land in respect of any issue of fact which has been tried and determined.

Even if we assume that section 44 applies—which is unclear[6]—the most one could say is that section 44 might then treat a judgment of dismissal, where silent, as "bind[ing] the parties, their privies and the land in respect of *any issue of fact which has been tried and determined.*" *Id.* (emphasis added). But no issue of fact was tried and determined in the severed case. At most a dismissal with prejudice might mean that Higgins could not bring the same action again.

The plaintiffs also rely on *McCarthy v. Town of Oak Bluffs*, 419 Mass. 227, 643 N.E.2d 1015 (Mass.1994). There, as here, a registration case in the land court was thereafter severed into two—one for property claimed east of a specific mean low water line and the other for land west of the line. *See* 643 N.E.2d at 1018. The former case was pursued and resulted in a decree of registration in 1960; the latter was dismissed in 1977 for lack of prosecution. *See id.* Thereafter, privies of the plaintiffs brought a new suit asserting title to the western portion, the subject of the dismissed suit, and the court held that the new suit could not be brought. *See id.* at 1019.

But the court's reasons destroy the parallel with the present case. The land court held in the new suit that the earlier one had made a factual determination of the western boundary of the property; and it was this finding to which the court gave preclusive effect. *See id.* at 1018–19, 1021. Further, it found that the original plaintiffs had signed a stipulation stating that they had no interest in land westward of the line, that licenses they had taken confirmed that concession, and that state law made it illegal for them to own land westward of the line. *See id.* at 1018–19. Thus *McCarthy* is not on point.

To sum up, we conclude that the rejection of the proposed amendment to the complaint cannot on this record be supported on the ground given for the denial. However, the plaintiffs' full faith and credit argument is without merit and to prevail ultimately, the plaintiffs would have to avoid the 1964 quiet title judgment and defeat a likely claim by the government that Higgins had obtained full title to the Lombard lot by adverse possession.[7] And if title to fractional interests were established by plaintiffs, problems of remedy would remain.

Such issues could be costly and time consuming to litigate on both sides. And,

---

6. At different times pertinent here the land court has been subject to different sets of civil procedure rules that also bear on whether a dismissal is with or without prejudice. *Compare* Mass.R.Civ.P. 1, 41(b)(1), 58(a), 79(a), with *Massachusetts Rules of Court* (1969), at 159, 162, 214 (reprinting pre–1974 versions of Superior Court Rules 79 and 85 and Land Court Rule 6).

7. Apparently plaintiffs' claim, on which we take no position, is that notice publication was constitutionally inadequate because some of the Lombard heirs lived in the county and could have been served personally. Moreover, it is unclear what basis the *guardian ad litem* had for believing that Higgins could claim title by adverse possession or what answer plaintiffs might have to such a claim.

while the government's hands are not perfectly clean (given its actual knowledge of Higgins's doubtful paper title to the whole), the plaintiffs are in some measure seeking a windfall from property widely thought to have been lost long ago by the family. All this suggests that both sides might be well advised to renew their earlier, unsuccessful efforts to settle the case.

The judgment of the district court is *vacated* and the case is *remanded* for further proceedings consistent with this opinion. Our judgment reinstates the partition statute claim merely as a contingent remedy available if and when the plaintiffs can establish ownership under the Quiet Title Act by satisfying the statute of limitations and all other prerequisites. Nothing in our decision precludes a further motion for summary judgment by the government on statute of limitations grounds (assuming a more developed record) or any other ground available to it.

*It is so ordered.*