# UNITED STATES *v.* BEGGERLY ET AL.

No. 97–731.   Argued April 27, 1998—Decided June 8, 1998

REHNQUIST, C. J., delivered the opinion for a unanimous Court. STEVENS, J., filed a concurring opinion, in which SOUTER, J., joined, *post*, p. 49.

*Paul R. Q. Wolfson* argued the cause for the United States. With him on the briefs were *Solicitor General Waxman, Deputy Solicitor General Schiffer, Deputy Solicitor General Kneedler, Martin W. Matzen, William B. Lazarus, John D. Leshy,* and *Margaret P. Fondry.*

*Ernest G. Taylor, Jr.,* argued the cause for respondents. With him on the brief were *Robert M. Arentson, Jr.,* and *Nancie G. Marzulla.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In 1979, the United States brought a quiet title action (the *Adams* litigation) in the Southern District of Mississippi against respondents and nearly 200 other defendants. On the eve of trial, the Government and respondents entered into a settlement whereby title to the disputed land was quieted in favor of the United States in return for a payment of $208,175.87. Judgment was entered based on this settlement agreement. In 1994, some 12 years after that judgment, respondents sued in the District Court to set aside the settlement agreement and obtain a damages award for the disputed land. Their claims for relief were based on the

court's ancillary jurisdiction, relating back to the *Adams* litigation, and on the Quiet Title Act (QTA). 28 U. S. C. § 2409a. We hold that respondents were not entitled to relief on either of these grounds.

The land in dispute between the United States and respondents is located on Horn Island. Situated in the Gulf of Mexico approximately 13 miles southwest of Pascagoula, Horn Island is currently within the State of Mississippi. It was, at various times during the late 18th and early 19th centuries, controlled by France, Britain, and Spain. It is part of the territory that came under the control of the United States as a result of the Louisiana Purchase of 1803. In 1950, Clark Beggerly, respondents' predecessor-in-interest, purchased color of title to two tracts of land on Horn Island at a tax sale in Jackson County. Beggerly paid $51.20 for one 626-acre tract. He and a friend also purchased a second tract for $31.25. Beggerly retained 103 acres upon a later division of this second tract.

In 1971, Congress enacted legislation authorizing the Department of the Interior to create the Gulf Islands National Seashore, a federal park on lands that include Horn Island. 16 U. S. C. § 459h. The legislation authorized the Secretary of the Interior to acquire privately owned lands within the proposed park's boundaries. § 459h–1. The National Park Service (NPS) began negotiating with respondents to purchase the land. Before any deal could be completed, however, the NPS learned that the United States Government had never patented the property. Believing that this meant that respondents could not have had clear title, the NPS backed out of the proposed deal.

During discovery in the *Adams* litigation, respondents sought proof of their title to the land. Government officials searched public land records and told respondents that they had found nothing proving that any part of Horn Island had ever been granted to a private landowner. Even after the settlement in the *Adams* litigation, however, respondents

continued to search for evidence of a land patent that supported their claim of title. In 1991 they hired a genealogical record specialist to conduct research in the National Archives in Washington. The specialist found materials that, according to her, showed that on August 1, 1781, Bernardo de Galvez, then the Governor General of Spanish Louisiana, granted Horn Island to Catarina Boudreau. If the land had been granted to a private party prior to 1803, title presumably could not have passed to the United States as a result of the Louisiana Purchase. Respondents believed that the Boudreau grant proved that their claim to the disputed land was superior to that of the United States.

Armed with this new information, respondents filed a complaint in the District Court on June 1, 1994. They asked the court to set aside the 1982 settlement agreement and award them damages of "not less than $14,500 per acre" of the disputed land. App. 26. The District Court concluded that it was without jurisdiction to hear respondents' suit and dismissed the complaint.

The Court of Appeals reversed. It concluded that there were two jurisdictional bases for the suit. First, the suit satisfied the elements of an "independent action," as the term is used in Federal Rule of Civil Procedure 60(b). According to the Court of Appeals, those elements are:

> "(1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law." 114 F. 3d 484, 487 (CA5 1997).

In its view, the settlement agreement could therefore be set aside. Second, the Court of Appeals concluded that the QTA conferred jurisdiction. The QTA includes a 12-year statute

of limitations, which begins to run from the date the plaintiff knows or should have known about the claim of the United States. 28 U. S. C. § 2409a(g). The Court of Appeals noted that respondents knew about the Government's claim for more than 12 years before it filed this suit, but concluded that the 12-year statute was subject to equitable tolling and should be tolled in this case.

Satisfied as to its jurisdiction, the Court of Appeals then addressed the merits. Relying on the Boudreau grant, the court concluded that the "United States has no legitimate claim to the land [and that] the validity of the Beggerlys' title is a legal certainty." 114 F. 3d, at 489. It therefore vacated the settlement agreement and remanded the case to the District Court with instructions that it enter judgment quieting title in favor of respondents. One judge dissented. We granted certiorari, 522 U. S. 1038 (1998), and now reverse.

The Government's primary contention is that the Court of Appeals erred in concluding that it had jurisdiction over respondents' 1994 suit. It first attacks the lower court's conclusion that jurisdiction was established because the suit was an "independent action" within the meaning of Rule 60(b). The Government argues that an "independent action" must be supported by an independent source of jurisdiction, and, in the case of a suit against the United States, an independent waiver of sovereign immunity. Whereas the District Court had jurisdiction over the original *Adams* litigation because the United States was the plaintiff, 28 U. S. C. § 1345, there was no statutory basis for the Beggerlys' 1994 action, and the District Court was therefore correct to have dismissed it.

We think the Government's position is inconsistent with the history and language of Rule 60(b). Prior to the 1937 adoption of the Federal Rules of Civil Procedure, the availability of relief from a judgment or order turned on whether the court was still in the same "term" in which the challenged judgment was entered. If it was, the judge "had ple-

nary power . . . to modify his judgment for error of fact or law or even revoke it altogether." *Zimmern* v. *United States*, 298 U. S. 167, 169–170 (1936). If the term had expired, resort had to be made to a handful of writs, the precise contours of which were "shrouded in ancient lore and mystery." Advisory Committee's Notes on 1946 Amdt. to Fed. Rule Civ. Proc. 60, 28 U. S. C. App., p. 787. The new Federal Rules of Civil Procedure did away with the notion that the continuation or expiration of a term of court had any affect on a court's power. Fed. Rule Civ. Proc. 6(c), rescinded 1966. New Rule 60(b)[1] sought to establish a new system to govern requests to reopen judgments. The original Rule 60(b) provided:

> "(b) Mistake; Inadvertence; Surprise; Excusable Neglect. On motion the court, upon such terms as are just, may relieve a party or his legal representative from a judgment, order, or proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect. The motion shall be made within a reasonable time, but in no case exceeding six months after such judgment, order, or proceeding was taken. A motion under this subdivision does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court (1) to entertain an action to relieve a party from a judgment, order, or proceeding, or (2) to set aside within one year, as provided in Section 57 of the Judicial Code, U. S. C., Title 28, § 118, a judgment obtained against a defendant not actually personally notified." Fed. Rule Civ. Proc. 60(b) (1940).

In the years following the adoption of the Rules, however, courts differed over whether the new Rule 60(b) provided the exclusive means for obtaining postjudgment relief, or whether the writs that had been used prior to the adoption of

---

[1] Rule 60(a) dealt then, as it deals now, with relief from clerical mistakes in judgments.

44

the Federal Rules still survived. This problem, along with several others, was addressed in the 1946 amendment to Rule 60(b). The 1946 amendment revised the Rule to read substantially as it reads now:

"(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U. S. C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as pre-

scribed in these rules or by an independent action."
Fed. Rule Civ. Proc. 60(b).

The new Rule thus made clear that nearly all of the old forms of obtaining relief from a judgment, *i. e., coram nobis, coram vobis, audita querela,* bills of review, and bills in the nature of review, had been abolished. The revision made equally clear, however, that one of the old forms, *i. e.,* the "independent action,"[2] still survived. The Advisory Committee notes confirmed this, indicating that "[i]f the right to make a motion is lost by the expiration of the time limits fixed in these rules, the only other procedural remedy is by a new or independent action to set aside a judgment upon those principles which have heretofore been applied in such an action." Advisory Committee's Notes, *supra,* at 787.

The "independent action" sounded in equity. While its precise contours are somewhat unclear, it appears to have been more broadly available than the more narrow writs that the 1946 amendment abolished. One case that exemplifies the category is *Pacific R. Co. of Mo.* v. *Missouri Pacific R. Co.,* 111 U. S. 505 (1884).[3]

In *Pacific* the underlying suit had resulted in a court decree foreclosing a mortgage on railroad property and ordering its sale. This Court enforced the decree and shortly thereafter the railroad company whose property had been foreclosed filed a bill to impeach for fraud the foreclosure decree that had just been affirmed. The bill alleged that the plaintiffs in the underlying suit had conspired with the attorney and directors of the plaintiff in the subsequent suit to ensure that the property would be forfeited. The plaintiff in the subsequent suit was a Missouri corporation, and it

---

[2] This form of action was also referred to as an "original action."

[3] The authorities that the Advisory Committee cited in its notes accompanying the 1946 amendment to the Rule list *Pacific* as an example of this cause of action. Moore & Rogers, Federal Relief from Civil Judgments, 55 Yale L. J. 623, 656 (1946); 3 J. Moore & J. Friedman, Moore's Federal Practice 3257, n. 12 (1938).

named several other Missouri citizens as defendants in its bill seeking relief from the prior judgment.

When the matter reached this Court, we rejected the contention that the federal courts had no jurisdiction over the bill because the plaintiff and several of the defendants were from the same State. We first noted that there was no question as to the court's jurisdiction over the underlying suit, and then said:

> "On the question of jurisdiction the [subsequent] suit may be regarded as ancillary to the [prior] suit, so that the relief asked may be granted by the court which made the decree in that suit, without regard to the citizenship of the present parties . . . . The bill, though an original bill in the chancery sense of the word, is a continuation of the former suit, on the question of the jurisdiction of the Circuit Court." *Id.*, at 522.

Even though there was no diversity, the Court relied on the underlying suit as the basis for jurisdiction and allowed the independent action to proceed. The Government is therefore wrong to suggest that an independent action brought in the same court as the original lawsuit requires an independent basis for jurisdiction.

This is not to say, however, that the requirements for a meritorious independent action have been met here. If relief may be obtained through an independent action in a case such as this, where the most that may be charged against the Government is a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion, the strict 1-year time limit on such motions would be set at naught. Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of "injustices which, in certain instances, are deemed sufficiently gross to demand a departure" from rigid adherence to the doctrine of res judicata. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238, 244 (1944).

Such a case was *Marshall* v. *Holmes*, 141 U. S. 589 (1891), in which the plaintiff alleged that judgment had been taken against her in the underlying action as a result of a forged document. The Court said:

> "According to the averments of the original petition for injunction . . . the judgments in question would not have been rendered against Mrs. Marshall but for the use in evidence of the letter alleged to be forged. The case evidently intended to be presented by the petition is one where, without negligence, laches or other fault upon the part of petitioner, [respondent] has fraudulently obtained judgments which he seeks, against conscience, to enforce by execution." *Id.*, at 596.

The sense of these expressions is that, under the Rule, an independent action should be available only to prevent a grave miscarriage of justice. In this case, it should be obvious that respondents' allegations do not nearly approach this demanding standard. Respondents allege only that the United States failed to "thoroughly search its records and make full disclosure to the Court" regarding the Boudreau grant. App. 23. Whether such a claim might succeed under Rule 60(b)(3), we need not now decide; it surely would work no "grave miscarriage of justice," and perhaps no miscarriage of justice at all, to allow the judgment to stand. We therefore hold that the Court of Appeals erred in concluding that this was a sufficient basis to justify the reopening of the judgment in the *Adams* litigation.[4]

The Court of Appeals did not, however, merely reopen the *Adams* litigation. It also directed the District Court to quiet title to the property in respondents' favor. The Court of Appeals believed that the QTA, 28 U. S. C. § 2409a, provided jurisdiction to do this. The QTA permits "plaintiffs

---

[4] We therefore need not address the additional requirement that evidence of the Boudreau grant would have changed the outcome of the original action. See, *e. g.*, *Pickford* v. *Talbott*, 225 U. S. 651, 657 (1912).

to name [the United States] as a party defendant in civil actions to adjudicate title disputes involving real property in which the United States claims an interest." *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 275–276 (1983). The QTA includes an express 12-year statute of limitations, which begins to run from the date upon which the plaintiff's cause of action accrued. An action under the QTA "shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." § 2409a(g).

The Court of Appeals acknowledged that the Beggerlys had known about the Government's claim to the land since at least 1979, more than 12 years before they filed this action in 1994. It concluded that the suit was not barred, however, because the QTA's statute of limitations was subject to equitable tolling, and that, "in light of the diligence displayed by the [respondents] in seeking the truth and pursuing their rights," equity demanded that the statute be tolled in this case. 114 F. 3d, at 489. In our view, the Court of Appeals was wrong in deciding that equitable tolling is available in a QTA suit.

Equitable tolling is not permissible where it is inconsistent with the text of the relevant statute. *United States* v. *Brockamp*, 519 U. S. 347 (1997). Here, the QTA, by providing that the statute of limitations will not begin to run until the plaintiff "knew or should have known of the claim of the United States," has already effectively allowed for equitable tolling. See *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 96 (1990) ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass"). Given this fact, and the unusually generous

nature of the QTA's limitations time period, extension of the statutory period by additional equitable tolling would be unwarranted. This is particularly true given that the QTA deals with ownership of land. It is of special importance that landowners know with certainty what their rights are, and the period during which those rights may be subject to challenge. Equitable tolling of the already generous statute of limitations incorporated in the QTA would throw a cloud of uncertainty over these rights, and we hold that it is incompatible with the Act.

The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, concurring.

As the Court correctly observes, the text of the Quiet Title Act, 28 U. S. C. § 2409a(g), expressly allows equitable tolling by providing that the statute of limitations will not begin to run until the plaintiff or the plaintiff's predecessor "knew or should have known of the claim of the United States." Because the Beggerlys were aware of the Government's claim more than 12 years before they filed this action, the Court correctly holds that there is no basis for any additional equitable tolling in this case. We are not confronted with the question whether a doctrine such as fraudulent concealment or equitable estoppel might apply if the Government were guilty of outrageous misconduct that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing of her own claim. Those doctrines are distinct from equitable tolling, see 4 C. Wright & A. Miller, Federal Practice and Procedure § 1056 (Supp. 1998); cf. *United States v. Locke,* 471 U. S. 84, 94, n. 10 (1985) (referring separately to estoppel and equitable tolling), and conceivably might

apply in such an unlikely hypothetical situation. The Court need not (and, therefore, properly does not) address that quite different type of case. Accordingly, I join the Court's opinion without reservation.