IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 98-41254

HEIRS OF H P GUERRA, DECEASED,

Plaintiff-Appellee,

versus

UNITED STATES OF AMERICA, Et. Al.,

Defendants,

UNITED STATES OF AMERICA,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

March 28, 2000

Before POLITZ, JOHN R. GIBSON,[*] and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is a saga from the border, worthy of the creativity of Cormac McCarthy. Its roots are earlier, but for our purposes, its genesis is the 1949 condemnation of mineral rights taken as part of the construction of the Falcon dam and reservoir along the U.S.-Mexican border. The government condemned approximately 3,000 acres of Horace Guerra's land and the accompanying mineral rights and compensated him pursuant to a final judgment. Guerra and later his heirs repeatedly requested revestment of the mineral rights. The government refused and by the mid-1980s had begun leasing the rights to third parties. In 1995, with a large fortune now at

[*] Circuit Judge of the Eighth Circuit, sitting by designation.

stake, the heirs brought this suit under the Quiet Title Act and Fed.R.Civ.P. 60(b), alleging an invalid taking and a violation of equal protection. The district court granted summary judgment to the Guerras. Today we REVERSE and grant summary judgment to the United States, holding that the heirs' claims cannot be brought under the Quiet Title Act and do not justify relief from the condemnation judgment under Fed.R.Civ.P. 60(b).

I

The condemnation was part of the Falcon dam and reservoir project built between Laredo and Roma, Texas. Congress authorized the condemnation in 1936 for the construction of dams and reservoirs on the U.S.-Mexican border with the lofty ambition of evening the episodic flow of the Rio Grande River. The Falcon project's dam and reservoir would cover an area of land cutting across Starr and Zapata Counties. Horace Guerra's land was located in Starr County and included the site of the planned dam.

In January 1949, the government filed declarations of taking to condemn Guerra's and the other Starr County owners' property. As only the surface and perhaps some constraints upon the exploitation of minerals seemed necessary to the project, Guerra and several other Starr County landowners wrote to the government asking to have their mineral interests excluded from the condemnation. The government responded that it would further consider the issue of revestment. What consideration the government gave we do not know. We do know that Guerra was not offered revestment.

2

In December 1949, the government condemned the land of the Zapata County landowners. It developed a plan for Zapata County whereby those landowners whose land met specific hydrogeologic conditions could retain title to their mineral interests or have them revested subject to a perpetual non-drilling easement. Zapata County landowners received written notice of the policy.

In December 1951, a jury awarded Guerra over $79,300 for the taking of his surface and mineral interests, substantially more than the government had offered. The Fifth Circuit affirmed the award in 1953 after the government appealed. The Guerras contend that Horace Guerra was unaware of the Zapata County policy until after the judgment had become final. He continued to petition for the return of the mineral interests, however, and in 1955, the government agreed to return the mineral interest regarding 677 acres of the land acquired from Guerra. After Guerra died, his heirs (the "Guerras") continued to request revestment of mineral rights throughout the 1950's and in 1960, 1980 and 1981. In 1981, the government told them again that it would not allow mineral exploration in the vicinity of the Falcon Dam and would not revest those rights.

Meanwhile, the government undertook various activities regarding the Guerras' condemned land. In 1954, it leased a 472-acre tract of the land to the State of Texas to use as a park, retaining the mineral interests. Sometime after 1959, the government began granting oil and gas leases on the land. It issued two leases in the early 1980's. In 1983, the government

3

entered lease negotiations with Huffco Petroleum Company for portions of the Guerra land that had not been previously leased. The government granted this lease in 1986 based on Huffco's evidence that it could safely explore the area with new technology. Huffco recorded the lease in 1991. The Guerras noticed drilling activities in 1992.

In 1995, Guerra's heirs filed suit under the Quiet Title Act (the "QTA"), Rule 60(b), and an independent action theory. On cross-motions for summary judgment, a magistrate judge recommended revestment of title in the mineral interests to the heirs and an award of restitution totaling $71.6 million. The district court adopted the recommendation of the magistrate judge. The government appealed under a variety of theories: that the court lacked jurisdiction to hear any claim; that it had no jurisdiction under the QTA; that the statute of limitations had run under the QTA; that res judicata bars the suit; that the heirs failed to satisfy the requirements of 60(b); and that the remedies of revestment and restitution are unavailable under either the QTA or 60(b).

II

The Guerras' claim to the mineral interests rests on two distinct legal assertions: that the initial taking of Horace Guerra's land was invalid, and that the government's refusal to revest the mineral rights since then amounts to a violation of equal protection. Their challenge to the validity of the taking faces significant hurdles given the final condemnation judgment and the passage of almost 50 years.

4

First, we cannot accept in full the government's argument that title cannot be disputed after the initial declaration of taking. We are persuaded rather that a declaration of taking creates only defeasible title, which the landowner is entitled to challenge.[2] Once a judgment has been entered in a condemnation proceeding, however, it enjoys the finality of a civil judgment.

The Quiet Title Act permits suit in cases in which the title to property is "disputed."[3] The district court allowed the heirs to pursue their claims under the QTA. We find no authority for the proposition that the QTA offers an escape from the constraints of res judicata. The two courts that have allowed QTA suits as a challenge to the validity of prior condemnation proceedings did so where the plaintiffs had received no notice of the proceeding and thus could not have participated in it.[4] In those cases, res judicata would not have precluded the claim; the plaintiffs needed only an avenue to get into court. Here, Horace Guerra participated fully in the condemnation proceedings. Even assuming that a QTA suit might be a proper vehicle for a challenge to a condemnation judgment under some circumstances,[5] it does not act to circumvent res judicata.

---

[2]See Catlin v. United States, 324 U.S. 229, 241 (1945).

[3]28 U.S.C. § 2409a (1999).

[4]See Fulcher v. United States, 632 F.2d 278, 285 (4th Cir. 1980) (en banc); United States v. Herring, 750 F.2d 669, 673 (8th Cir. 1984).

[5]The First Circuit has held that Quiet Title Act suit cannot proceed after a condemnation judgment. See Cadorette v. United States, 988 F.2d 215, 225-26 (1st Cir. 1993) (Breyer, C.J.).

Alternatively, the Guerras seek to employ Rule 60(b) of the Federal Rules of Civil Procedure to directly attack the condemnation judgment.[6]  The provision of Rule 60 potentially available to the Guerras is 60(b)(6), which allows a court to vacate a judgment when it is appropriate to accomplish justice.[7]  A court may grant relief under 60(b)(6) only under extraordinary circumstances.[8]

The Guerras argue that evidence discovered after the final judgment -- the Zapata County revestment policy and the government's leases to third parties -- reveal that the original taking was invalid.  A condemnation is valid if, at the time of the taking, the government's exercise of eminent domain served a valid statutory purpose.[9]  Courts have limited power to review an

---

[6]See FED.R.CIV.P. 60(b) (1999).

[7]The first three provisions of Rule 60(b) are time-barred after one year.  Rule 60(b)(4) allows relief only if the initial court had no jurisdiction over the proceedings or if the proceedings violated due process.  The Guerras do not allege any jurisdictional defect or procedural failure regarding the condemnation suit itself.  Relief under Rule 60(b)(5) is also unavailable here: that rule allows only relief from a judgment that has prospective effect. See In re Moody, 849 F.2d 902, 906 (5th Cir. 1988).

[8]See Klapprott v. United States, 335 U.S. 601, 613-14 (1949); American Totalisator Co., Inc. v. Fair Grounds Corp., 3 F.3d 810, 815 (5th Cir. 1993).  The independent action theory, under which the Guerras also seek relief, presents a similarly high hurdle: it requires a case of gross injustice sufficient to demand a departure from res judicata.  See United States v. Beggerly, 118 S. Ct. 1862, 1866-67 (1998).

[9]Catlin, 324 U.S. at 241.

6

agency's determination of public purpose.[10]  A court may invalidate a taking only if the officials acted in bad faith or so capriciously and arbitrarily that the action was without an adequate determining principle.[11]  In examining whether the taking was arbitrary and capricious, we look at the agency's authorization to condemn the land.  The enabling legislation for the Falcon project authorized the agency to take any "real or personal property which may be necessary."[12]  The statute did not define "necessary."

We fail to see how the government's policy for Zapata County landowners made the taking of the Starr County mineral interests arbitrary and capricious.  When it undertook the first stage of condemnations, the government's initial policy was to condemn the mineral rights in order to secure the safety of the dam and reservoir.  That a year later, the government felt secure in initiating a new policy for the next stage of condemnations does not render the taking of Guerra's interest without an adequate determining principle.  The policies developed over time and at separate stages of condemnations for the project.

Nor can we infer from the government's leasing of the rights that it had originally condemned the land in bad faith. Equally, the government's abandonment of the non-use policy in the early

---

[10]See United States v. 2,606.84 Acres of Land, 432 F.2d 1286, 1289 (5th Cir. 1970).

[11]See United States v. Carmack, 329 U.S. 230, 243 (1947).

[12]See 22 U.S.C. 277c(b) (1936).

1980's does not invalidate the taking. The government may change its use of the property without affecting the validity of the original condemnation.[13] The events subsequent to the taking of the Guerras' land, including the government's changed policy regarding revestment and its altered uses of the land, do little to suggest the invalidity of the original condemnation. We find no extraordinary circumstance that would justify re-opening the judgment.

The Guerras also contend that the refusal to revest the mineral rights denies them equal protection under the Fifth Amendment. It is uncertain whether the government even classified Starr County landowners differently from Zapata County landowners by undertaking the condemnations at separate times and using different policies. Even assuming that the government's actions did classify the two groups differently, the classification involves no suspect class and thus need only bear a rational relation to a legitimate governmental purpose.[14] The government condemned land in the two counties at different times, and it was not irrational to refuse to make the Zapata County policy retroactively available to the Starr County landowners.

The Guerras fared more poorly than did their Zapata County neighbors in the Falcon Dam saga, and the government's steadfast refusal to revest their mineral rights, coupled with its current

---

[13]See Higginson v. United States, 384 F.2d 504, 507 (6th Cir. 1967).

[14]Richard v. Hinson, 70 F.3d 415, 417 (5th Cir. 1995).

profits in leasing those rights, makes the government's policies seem inequitable. But much government action that is less than ideal falls short of a constitutional injury. The Guerras were paid for the minerals in an amount fairly determined in litigation. The government became the record owner. The later development of the mineral interests and their greatly enhanced value reflect the good fortune of the owner of the minerals. That the minerals were acquired in condemnation does not make that circumstance unfair or illegal. Ultimately, the Guerras' allegations of an invalid taking or an equal protection violation cannot overcome the deference courts owe governmental bodies to accomplish legislative ends. The acts of which the Guerras complain are thus not ours to remedy.

REVERSED.