**Ann McAllister OLIVARIUS, Appellant/Cross–Appellee,**

v.

**The STANLEY J. SARNOFF ENDOW-MENT FOR CARDIOVASCULAR SCIENCE, INC., Appellee/Cross–Appellant.**

No. 02–CV–471, 02–CV–813, 02–CV–814.

District of Columbia Court of Appeals.

Argued Dec. 10, 2003.

Decided Sept. 9, 2004.

Jeffrey L. Poston, Washington, with whom Trina L. Fairley was on the brief, for appellant/cross-appellee.

Laurie A. Holmes, Chicago, IL, for appellee/cross-appellant.

Before FARRELL and GLICKMAN, Associate Judges, and STEADMAN,

Associate Judge, Retired.*

GLICKMAN, Associate Judge:

The main issue in this appeal is whether the trial court erred in denying a motion to vacate a final judgment confirming an arbitration award that allegedly had been procured by fraud. To decide that issue, we must explore the potential bases for such a motion that are set forth in Superior Court Civil Rule 60(b). Ultimately we conclude that the motion in this case was untimely under Rule 60(b), and non-compliant in other respects as well with that Rule's requirements, and hence that the motion properly was denied.

A second issue before us, raised in the cross-appeal, is whether the trial court erred in denying a motion for sanctions under Superior Court Civil Rule 11(c) without first holding an evidentiary hearing. We conclude that, under the circumstances, the court did not abuse its discretion in deciding that a hearing would be unnecessary and unproductive.

## I.

Appellant Ann McAllister Olivarius was employed by The Stanley J. Samoff Endowment for Cardiovascular Science, Inc. ("the Endowment") as its President, Chief Executive Officer, and General Counsel until June 1996, when the Board of Directors of the Endowment voted to terminate her for cause. At that time, the Endowment was pursuing a lawsuit in Maryland against Olivarius's former employer, the law firm of Shearman & Sterling, over a sizable bequest to the Endowment from its founder, while Shearman & Sterling was simultaneously suing Olivarius in New York over her alleged misconduct during her tenure at the firm. The decision by the Endowment's Board to terminate Olivarius for cause was precipitated by certain actions she took in connection with the Maryland and New York litigation. These actions included (1) Olivarius's allegedly deceptive attempts to deprive the Board of its litigation counsel's advice at a meeting on June 7, 1996, regarding her request that the Endowment fund her defense and her assertion of counterclaims in the New York action, and (2) Olivarius's allegedly unauthorized disclosure to her personal counsel in the New York action of a confidential litigation memorandum prepared for the Board by its counsel.

Olivarius disputed the Board's justifications for terminating her and tried without success to persuade the Board to rescind its action. Her employment contract, which stated that it was governed by Maryland law, provided that any disputes relating to her termination would be settled by arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. In accordance with that provision, Olivarius initiated an arbitration proceeding in which she claimed that the Endowment had terminated her without cause and therefore owed her severance benefits.

The arbitration was held in Washington, D.C., over the course of twelve days in April and May of 1998. On August 12, 1998, the arbitrator issued a comprehensive, 67–page Opinion and Award setting forth his determination that the Board had "ample cause" to terminate Olivarius. The arbitrator summarized his main conclusions as follows:

> Specifically, I conclude that Claimant [Olivarius] attempted to conceal from the Board material information relating to the actions proposed in the Agenda for the June 7, 1996 Board meeting [re-

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on August 8, 2004.

lating to Olivarius's indemnification and counterclaims]; attempted to deprive the Board of the advice of its counsel on the actions proposed; intentionally altered the Agenda forwarded to F & S [the Board's counsel] to prevent F & S from participating in and providing advice to the Board at the June 7, 1996 Board meeting; concealed material information from the Board relating to the risks and possible adverse consequences to the Endowment of Claimant's assertion of counterclaims in the New York action; deceived the Board by advising it during the Board meeting that F & S did not wish to be present at the Board meeting due to a "conflict"; and attempted to conceal from F & S that she intended to present to the Board for approval resolutions which would enable her to obtain indemnification and, at she [sic] and her counsel's discretion, assert counterclaims in the New York action. Those actions breached Claimant's fiduciary obligations to the Endowment and constituted, as indicated, prohibited conflicts of interest. I conclude that the Endowment had ample cause for the termination of Claimant and that it properly terminated Claimant pursuant to the resolutions unanimously adopted by the Board on June 20, 1996.

The arbitrator further concluded that the Board also had cause to terminate Olivarius for her unauthorized disclosure of the confidential litigation memorandum to her personal counsel.

Unwilling to accept this adverse outcome, Olivarius filed a motion in District of Columbia Superior Court to vacate the arbitrator's award. The Endowment moved to confirm it. On December 14, 1999, the court denied Olivarius's motion and confirmed the award. Olivarius did not appeal this judgment.

Sixteen months later, however, on April 13, 2001, Olivarius moved in Superior Court to vacate both the arbitration award and the December 1999 judgment confirming it. In her motion, Olivarius alleged that during the preceding month she was granted access to the file of a sympathetic former director of the Endowment. Olivarius claimed that she found documents in that file that would have exonerated her had they been produced in the arbitration. "[I]n particular," Olivarius alleged, the file contained a letter that she had faxed to the Board of the Endowment on June 6, 1996—the day before the fateful Board meeting—in which she had "revealed the very information that the Endowment claimed she had concealed." This June 6 letter also allegedly confirmed that Olivarius had the Board's prior authorization to share the Endowment's confidential litigation memorandum with her counsel in the New York litigation. In short, the letter served to refute every ground on which the arbitrator had found in favor of the Endowment. Olivarius charged that the Endowment had withheld this key letter, even though she had requested it specifically during the discovery phase of the arbitration,[1] as well as other documents of lesser, though still significant, import that she had culled from the former director's file. The Endowment, Olivarius conclud-

---

1. In response to Olivarius's discovery request during the arbitration for her letter of June 6, the Endowment did in fact produce another letter that Olivarius had sent to its Board on that date. The June 6 letter that the Endowment produced covered the same ground as the allegedly withheld letter, except that it did not contain the exonerating passages. Olivar-

ius now claims that she sent the Endowment two letters on June 6, only the first of which the Endowment turned over to her. However, when the Endowment produced only that first June 6 letter in discovery, Olivarius did not call upon it to turn over the alleged second letter as well.

ed, thereby had procured its arbitration award by fraud.

Olivarius based her motion on the Maryland Arbitration Act, which provides that a court "shall vacate" an award if it was "procured by corruption, fraud, or other undue means." MD. CODE ANN., CTS. & JUD. PROC. § 3–224(b)(1) 2002. She claimed that her motion was timely because the Maryland Act provides that "[i]f a petition [to vacate an award] alleges corruption, fraud, or other undue means it shall be filed within 30 days after the grounds become known or should have been known to the petitioner." *Id.* at § 3–224(a)(2). Olivarius argued that Maryland law governed the disposition of her motion by virtue of the choice of law provision in her employment contract with the Endowment.

The Endowment opposed Olivarius's motion to vacate on both procedural and substantive grounds. As a threshold matter, the Endowment argued that D.C. law rather than Maryland law applied. Olivarius's motion therefore was untimely, according to the Endowment, because Superior Court Civil Rule 60(b) requires a motion for relief from a final judgment on grounds of fraud or newly discovered evidence to be filed within one year after the judgment was entered. Further, on the merits, the Endowment alleged that the key docu-ments on which Olivarius relied—in particular, the June 6 letter—were not genuine. Rather, the Endowment charged, Olivarius had fabricated those documents in a last-ditch effort to overturn the award. Based on that allegation of wrongdoing, the Endowment moved for sanctions against Olivarius pursuant to Superior Court Civil Rule 11(c).

Each side supported its positions on the two motions with numerous affidavits and exhibits. The trial court issued an order denying Olivarius's motion as untimely on March 21, 2002. Olivarius moved for reconsideration, but the court adhered to its conclusion in a revised order that it issued on June 11, 2002. The court agreed with Olivarius that the timeliness of her motion was governed by the Maryland Arbitration Act rather than Superior Court Civil Rule 60(b). Nonetheless, the court ruled, the motion was untimely under § 3–224(a)(2) of the Maryland Act because "Olivarius was on inquiry notice of the allegedly concealed documents, particularly the June 6th facsimile, by no later than May 16, 1998, the final day of arbitration hearings." [2] Based on its "close examination of the arbitration record," the court found that Olivarius "had the full ability in 1998 to thoroughly pursue the June 6 facsimile and the other subject documents. Yet she inexcusably failed to do so." [3]

---

**2.** The court also ruled in the alternative that "even if the Olivarius motion were timely, the availability of the allegedly withheld documents would not have nullified all of the arbitrator's conclusions that [she] was properly terminated 'for cause.'" In deciding this appeal we do not reach the merits of this alternative ruling, which Olivarius challenges as erroneous.

**3.** In reaching this conclusion, the court found that the record of the arbitration "belie[d] Dr. Olivarius's claim that, in 1998, she had diminished memory and no knowledge" of the allegedly withheld documents. During the twelve days of hearings, Olivarius manifested her "clear recollections of factual details"; in addition, "the arbitration process generated numerous documentary materials which should have led her to recall and request the crucial facsimile of June 6, 1996," in particular. As an example of such materials, the court cited a lengthy letter that Olivarius sent to two directors of the Endowment one month later, on July 6, 1996, in which she provided "a detailed description of what she and others said and did in preparation for the June 7 Board meeting." (We shall have occasion to advert to this letter again later in this opinion.)

The trial court also denied the Endowment's motion for Rule 11 sanctions. Stating that it had "waded through the marsh of conflicting testimony," the court declared in its order that "the evidence is in equipoise regarding whether there was fraudulent concealment by the Endowment or whether Olivarius fraudulently created the subject documents." The Endowment filed a motion for reconsideration, in which it "respectfully suggest[ed] that the Court may have erred in failing to hold an evidentiary hearing to resolve the factual issue"—a hearing the Endowment had chosen not to request in its initial motion, in the admittedly "optimistic" belief that its affidavits and documentary evidence would suffice. Thereafter, the court issued an order reaffirming its denial of sanctions. Clarifying its first order, the court stated that the Endowment "had not met its burden of proof.... Put another way, the Endowment's evidence did not outweigh Dr. Olivarius's." Emphasizing that it had given "careful consideration [to] the voluminous record," the court declined to hold an evidentiary hearing, explaining:

> There was no legal duty upon the court to hold a hearing on the subject motion. The court decided then (and maintains the opinion now) that a hearing was unnecessary and would have been wasteful of resources because the submissions of the parties were extraordinarily abundant.

## II.

Olivarius's appeal of the denial of her motion to vacate turns on questions of law, as to which our review is *de novo*.

Although we do not agree entirely with the trial court's legal rationale, we affirm its ruling. When "the result is correct" as a matter of law, a lower court decision may be upheld "despite the fact that the court 'relied upon a wrong ground or gave a wrong reason.'" *Marinopoliski v. Irish*, 445 A.2d 339, 340 (D.C.1982) (quoting *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937)). *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 38–39, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). *Cf. Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 559 (D.C.2001).

The trial court agreed with Olivarius that the timeliness of her motion in this case is governed by Maryland law because of the choice of law provision in her employment contract. In support of this proposition, Olivarius cites cases holding that a choice of law provision in a contract that provides for arbitration may determine which jurisdiction's time limits apply to a motion to vacate an arbitration award. *See, e.g., Ekstrom v. Value Health, Inc.*, 314 U.S.App. D.C. 340, 343–44, 68 F.3d 1391, 1394–95 (1995). The rationale of this rule is that where a statute of the jurisdiction named in the choice of law provision is the source of the right to challenge the arbitration award and grants that right subject to time limits on its exercise, those time limits are part of the definition of the right and cannot be divorced from the substantive law to which the contracting parties agreed to be bound. *Id.*, 314 U.S.App. D.C. at 344, 68 F.3d at 1395. Positing the applicability of this principle, Olivarius frames the issue on appeal as

---

Although Olivarius had sustained what was referred to as a "closed head" injury in a 1996 automobile accident, the court found that this injury did not compromise her ability to seek the allegedly withheld documents. This finding is well supported by the record. We need not go into detail on this point;

Olivarius proffered no evidence that she suffered memory impairment as a result of the accident, and she concedes on appeal that "[u]ltimately, [her] closed head injury is of little consequence" to the issues now before us.

being whether or not the trial court applied the inquiry notice provision of Maryland law correctly.

Maryland law is not dispositive in this case, however, if only because Olivarius did not merely seek to vacate an arbitration award. Of necessity, Olivarius also sought relief from the December 1999 ruling of the District of Columbia Superior Court denying her first motion to vacate the award and granting the Endowment's motion to confirm it. That unappealed ruling was a final judgment of the court, on its face binding and enforceable like any other final judgment. *See, e.g., Hogue v. Popham Haik Schnobrich & Kaufman Ltd.*, 753 A.2d 1014, 1017 (D.C.2000); D.C.Code § 16–4313 (2001). "Once a trial court issues a final ruling dispositive of a lawsuit, there is only a limited number of ways in which the parties in a case can seek to reopen the matter." *Clement v. District of Columbia Dep't of Human Servs.*, 629 A.2d 1215, 1217 (D.C.1993). Since Olivarius neither took an appeal nor moved within ten days for a new trial or to amend the judgment, *see* Super. Ct. Civ. R. 59(b), (e), her motion for relief from the December 1999 final judgment of the Superior Court confirming the arbitration award was governed by Superior Court Civil Rule 60(b). *See id.*, at 1218–20; *see also Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 321 U.S.App. D.C. 191, 193, 98 F.3d 640, 642 (1996) (noting that "Rule 60(b) is an appropriate vehicle by which to challenge a judgment confirming an arbitration award"). In *Clement* we specifically rejected "the possibility of some kind of inherent authority" not recognized in the Rules for a trial court in this jurisdiction "to reopen a final definitive judgment once issued and markedly change its nature and effect." 629 A.2d at 1220.

Thus, even if Maryland law is applicable under *Ekstrom* to Olivarius's challenge to the award in her arbitration, choice of law rules do not displace the time limits that apply by virtue of Rule 60(b) to her motion for relief from a judgment of the Superior Court. A standard choice of law provision such as that in Olivarius's contract is "generally understood to incorporate only substantive law, not procedural law such as statutes of limitation." *Federal Deposit Ins. Corp. v. Petersen*, 770 F.2d 141, 142 (10th Cir.1985). "Under customary choice of law principles, the laws of the forum ... apply to matters of procedure ... and, save where limitations is part of the cause of action itself, [a] limitation on the time of suit is procedural and is governed by the law of the forum." *Huang v. D'Albora*, 644 A.2d 1, 4 (D.C.1994) (internal quotation marks and citations omitted). Regardless of whether any time limits imposed by Maryland law can be said to be "part of" Olivarius's right to challenge the award in an arbitration under her contract with the Endowment, no such Maryland law provisions may be said to be "part of" her right to challenge the validity of a final judgment of a District of Columbia court. As the rationale of *Ekstrom* does not apply to the latter challenge, it is subject to the procedural rules of the forum jurisdiction. Accordingly, we proceed to examine whether Superior Court Civil Rule 60(b) permits Olivarius to attack the Superior Court's judgment at this time.

Rule 60(b) provides as follows:

*Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial

under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than 1 year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis and audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these Rules or by an independent action.

Super. Ct. R. Civ. P. 60(b). "[T]he purpose of 60(b) is to respect the finality of judgments by providing post-judgment relief only under exceptional circumstances, ... in unusual and extraordinary situations justifying an exception to the overriding policy of finality, ... or where the judgment may work an extreme and undue hardship." *Clement*, 629 A.2d at 1219 (internal citations omitted). Federal court decisions interpreting the virtually identical counterpart of our Rule 60(b) in the Federal Rules of Civil Procedure are "persuasive authority in interpreting the local rule." *Id.* at 1219 n. 8 (quoting *Goldkind v. Snider Bros., Inc.*, 467 A.2d 468, 472 (D.C.1983)).

There are several potential avenues identified in Rule 60(b) that a litigant such as Olivarius might pursue in seeking to overturn a judgment on the ground that it was procured by fraud. We examine the availability of each of those avenues in turn.

■ The obvious place to begin is with subsection (b)(3), which explicitly permits the court to grant a party relief from a final judgment on grounds of fraud, misrepresentation, or other misconduct of an adverse party. The Rule states, however, that a motion based on (b)(3) grounds must be made within one year after the judgment was entered. While Olivarius's motion also could be viewed as one based on newly discovered evidence, *see* Rule 60(b)(2), the same one-year limitation would still apply. Olivarius did not satisfy this requirement, for the judgment confirming the arbitration award was entered in December 1999 and she did not file her motion to overturn it until April 2001. There is "no elasticity in Rule 60(b)'s one-year time limit on the motions to which it applies; it is not judicially extendable...." *Carr v. District of Columbia*, 177 U.S.App. D.C. 432, 440–41, 543 F.2d 917, 925–26 (1976).

None of the other enumerated subsections of Rule 60(b) apply here. Olivarius cites the catchall provision of subsection (b)(6), which allows a court to set aside a final judgment for "any other reason justifying relief." Although the one-year limitation does not apply to (b)(6), this subsection is of no help to Olivarius. She relies solely on allegations of fraud and newly discovered evidence that are encompassed by subsections (b)(3) or (b)(2); her motion does not proffer "any other reason." Subsection (b)(6) does not authorize a court to grant relief for reasons that are specified

in the other subsections of the Rule. *Partnership Placements, Inc. v. Landmark Ins. Co.,* 722 A.2d 837, 844 (D.C.1998). "To interpret 60(b)(6) any other way would make the time limitations on motions under 60(b)(1)-(3) meaningless." *Baltia Air Lines,* 321 U.S.App. D.C. at 193, 98 F.3d at 642. "[T]he more lenient provisions of Rule 60(b)(6) may not be used to nullify [those] specific time limitations." *Partnership Placements,* 722 A.2d at 844 (quoting *Household Fin. Corp. v. Frye,* 445 A.2d 991, 992 (D.C.1982)).

As to the remaining numbered subsections of Rule 60(b), Olivarius has not contended that the judgment was entered as the result of "mistake, inadvertence, surprise, or excusable neglect" (subsection (b)(1)), and the one-year limitation of Rule 60(b) would still apply even if she had. Nor can Olivarius contend that the December 1999 judgment is "void" within the meaning of subsection (b)(4). *See Jones v. Hersh,* 845 A.2d 541, 545 (D.C.2004) (explaining that a judgment is "void," as opposed to voidable, only if the court had no power to render it). "A judgment procured by fraud, like an erroneous judgment, is generally not considered void and, for the same reasons, may still be the basis for claim preclusion." 18 MOORE'S FEDERAL PRACTICE § 131.30[1][c] (Matthew Bender 3d ed.2004). Subsection (b)(5) has no pertinence here either—Olivarius does not seek relief because the judgment has been "satisfied, released, or discharged," and a judgment confirming an award denying damages is not a judgment of "prospective application" as (b)(5) uses that term. *See Twelve John Does v. District of Columbia,* 268 U.S.App. D.C. 308, 314, 841 F.2d 1133, 1139 (1988).

■ In addition to listing specific grounds for relief in subsections (1) through (6), Rule 60(b) states that it "does not limit the power of a court ... to set aside a judgment for fraud upon the court." As we explained in *Partnership Placements,* however, this language is "narrowly construed and 'confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged.'" 722 A.2d at 844 (quoting *Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters,* 675 F.2d 1349, 1356 (4th Cir. 1982)). "Fraud on the court ... is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Bulloch v. United States,* 763 F.2d 1115, 1121 (10th Cir.1985) (en banc). The concept "refers only to 'very unusual cases involving far more than an injury to a single litigant.'" *Baltia Air Lines,* 321 U.S.App. D.C. at 193–94, 98 F.3d at 642–43 (quoting 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2870 at 415 (1995)).

■ Olivarius has not made allegations that the judgment in the present case was the result of a fraud upon the court. We assume, *arguendo,* that "fraud upon the court" may be taken to encompass a sufficiently grievous fraud committed in an underlying arbitration proceeding (although that proposition is not self-evident). Even so, "[t]he discovery violations alleged by appellant[ ] affect only the individual parties; they do not threaten either the court's [or arbitrator's] ability to function or the interests of the general public." *Partnership Placements,* 722 A.2d at 845. "Allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court." *Id.* (quoting *Bulloch,* 763 F.2d at 1121; internal citations omitted). "[E]ven when perjury has been committed, there is no fraud on the court as

that term is used in rule 60(b)." *Id. See also, e.g., Browning v. Navarro,* 826 F.2d 335, 345 n. 12 (5th Cir.1987) ("The courts have uniformly held that perjury of a single witness, false evidence (in the absence of attorney involvement) or mere nondisclosure are insufficient to establish fraud upon the court.").[4]

Finally, Rule 60(b) preserves as a last resort the possibility that a court may "entertain an independent action to relieve a party from a judgment." This proviso refers to an independent action in equity. Strictly speaking, such an action is not limited to cases involving true fraud upon the court, but may be maintained to redress other especially egregious wrongdoing. *See* 12 MOORE'S FEDERAL PRACTICE § 60.81[1][b][v]. But the prerequisites to relief by way of an independent equitable action are strict, and Olivarius does not meet them.

■ In the first place, the independent action contemplated by Rule 60(b) is available "only to prevent a grave miscarriage of justice." *United States v. Beggerly,* 524 U.S. 38, 47, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). The party seeking relief must show that it would be "manifestly unconscionable" to allow the judgment to stand. *Pickford v. Talbott,* 225 U.S. 651, 657, 32 S.Ct. 687, 56 L.Ed. 1240 (1912). This stringent standard is not met "where the most that may be charged ... is a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion"; if that were so, the Supreme Court stated, "the strict 1–year time limit on such motions would be set at naught." *Beggerly,* 524 U.S. at 46, 118 S.Ct. 1862; *accord, Gleason v. Jandrucko,* 860 F.2d 556, 559–60 (2d Cir.1988) ("[A]llegations of nondisclosure during pretrial discovery do not constitute grounds for an independent action under Fed.R.Civ.P. 60(b)."); 12 MOORE'S FEDERAL PRACTICE § 60.82[4] (stating that "an allegation that an adverse party failed to furnish relevant information in the original litigation does not present so grave a miscarriage of justice as to justify reopening the prior judgment" in an independent action). As *Beggerly* indicates, the one-year time limit in Rule 60(b) on motions to set aside wrongly procured judgments strikes a balance that is not to be disregarded lightly.[5] For that

4. Because attorneys are officers of the court, their dishonest participation in the concealment of evidence or other wrongdoing may transform a "garden-variety" fraud claim into a claim of fraud upon the court. *See, e.g., H.K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1118–19 (6th Cir.1976). Although she makes no specific factual allegations in this vein, Olivarius has suggested in her arguments that the attorneys who represented the Endowment in the arbitration must have known of the alleged withholding of crucial documents. "This is indeed a serious charge [that] ought not to be recklessly made without substantial support." *Id.* Such support is lacking in this case; we have no affidavit, for instance, from the former director whose file Olivarius perused stating that she had provided the allegedly withheld documents to the Endowment's attorneys during the arbitration. As Olivarius's mere suggestion of attorney involvement (which the Endowment denies) is neither fact-specific nor substantiated—it is really no more than hypothesis or speculation—it does not suffice to make her claim one of fraud upon the court.

5. The Fourth Circuit has explained this balance as follows:

Respect for the finality of judgments is deeply engrained in our legal system. As Justice Story observed, "(i)t is for the public interest and policy to make an end to litigation ...." so that "suits may not be immortal, while men are mortal." *Ocean Ins. Co. v. Fields,* 18 F.Cas. 532, 539 (No. 10,406) (C.C.D.Mass.1841) (Story, J. sitting as Circuit Judge). *See also Southern Pacific RR Co. v. United States,* 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Equally compelling circumstances may arise, however, in which parties are entitled to be relieved of an unjust judgment arrived at through

reason, courts typically require more flagrant misconduct to support an independent action in equity than "perjury at trial or in discovery proceedings or presentation of false documents in evidence." 12 MOORE'S FEDERAL PRACTICE § 60.81[1][b][ii]; *see, e.g., Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp.,* 71 F.3d 44, 48–49 (1st Cir.1995).

■ Accepting Olivarius's allegations at face value, they do not establish that a "grave miscarriage of justice" occurred. If it is true that the Endowment wrongfully withheld documents that would have supported Olivarius's claim, its conduct was deplorable, but the Endowment did not thereby "actually prevent[ ] an issue from being joined or a party from making a valid claim or defense." *Great Coastal Express,* 675 F.2d at 1358. Nor are the documents in question as helpful to Olivarius as she asserts. To the contrary, we are struck by the fact that, on matters of critical importance that were squarely within her personal knowledge, Olivarius testified in contradiction to the most important document—the letter she allegedly sent the Endowment's Board on June 6, 1996—on which she now relies for her exoneration.

One such contradiction related to the charge, which the arbitrator found to be true, that Olivarius deviously altered the agenda for the June 7 Board meeting before sending it to the Endowment's counsel, to prevent him from advising the Board with regard to her indemnification requests. The June 6 letter allegedly informed the Board before the meeting that Olivarius had deleted references in the agenda to her indemnification in the New York litigation and related matters "at Joanne's [director Ingwall's] instruction." In the arbitration, Olivarius did not testify either that she informed the Board of the deletions before the meeting or that she made those deletions at Ingwall's direction. Instead, Olivarius claimed that she was justified in sending a truncated agenda to the Endowment's counsel on her own initiative and without the Board's knowledge. Moreover, her failure to testify that she acted at a director's "instruction" and informed the Board before it met cannot be attributed easily to a mere failure of memory, as Olivarius suggests. Such an explanation, which is certainly implausible given the central importance of the issue, is confuted by a letter explicating her behavior that Olivarius wrote to two of the directors, including Ingwall, a month *after* the Board meeting. In that July 6, 1996 letter, Olivarius said nothing about having acted at Ingwall's (or any other director's) behest or about previously having told the Board what she had done.[6]

---

mistake, ignorance, inadvertence or misconduct. *See, e.g., Publicker v. Shallcross,* 106 F.2d 949, 952 (3d Cir.1939), *cert. denied,* 308 U.S. 624, 60 S.Ct. 379, 84 L.Ed. 521 (1940) ("We believe truth is more important than the trouble it takes to get it.")

Federal Rule of Civil Procedure 60 provides the terms on which these two principles are balanced. Rule 60(b)(3) allows a court to relieve a party from final judgment on the grounds of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." A motion under 60(b)(3), however, must be made within one year after the judgment was entered. Thus, the Rule suggests that equitable considerations prevail in such cases for one year, and that the interest in finality of judgments prevails thereafter.

*Great Coastal Express,* 675 F.2d at 1354–55.

**6.** Olivarius provided the following explanation in her July 6 letter:

At 7 PM the night before the Board meeting, after all the Board packets had been distributed, Freishtat [the Board's counsel] called with an odd, nervous tone I had not heard before to say that he *did* wish to attend the meeting and see the docu-

To give a second example of a material contradiction on an important matter within Olivarius's personal knowledge, the June 6 letter purportedly memorializes the fact that a majority of the Board "asked" Olivarius to send the confidential litigation memorandum prepared by the Endowment's counsel to her personal attorney. In the arbitration, however, Olivarius testified that she "did not need Board approval" to make that disclosure so long as the Board would "back it up later." This issue, too, was of such significance that it is difficult to excuse Olivarius's contradictory testimony as a mere slip of memory.

Especially in view of these material inconsistencies, Olivarius's allegations fall far short of what is required to support an independent action in equity. We cannot agree that the alleged withholding of documents in discovery caused Olivarius to be the victim of a grave miscarriage of justice when her own testimony was contrary to what her newly discovered documents purport to say.

We do not base our decision solely on that fact, however. There are other equally important prerequisites to an independent action that Olivarius does not meet. The traditional requirements of an action in equity, including "the absence of fault or negligence" on the part of the movant, are strictly applicable. *Great Coastal Express*, 675 F.2d at 1358 (quoting *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 667–68 (5th Cir.1981)). "Lack of diligence by [the] party seeking relief bars equitable relief." 12 MOORE'S FEDERAL PRACTICE § 60.82[2]. Thus, "[a]n independent action for fraud may not be entertained if 'there was an opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action.' " *M.W. Zack Metal Co. v. Int'l Navigation Corp. of Monrovia*, 675 F.2d 525, 529 (2d Cir.1982) (internal citation omitted). Olivarius "had prior opportunities to raise [her] fraud claims." *Id.* She knew or should have known that the Endowment had not produced the allegedly withheld June 6 letter for which she had asked: she herself was the missing document's author. Yet, she acquiesced in the non-production, raising no objection to it either during the arbitration or when she first moved in Superior Court to vacate the award. This was not due diligence on her part.[7]

Olivarius argues that her lack of diligence should be excused because the Endowment would have denied the existence of the June 6 letter (then as now). But

ments. . . . I asked him about the conflict of interest which had persuaded him previously to stay away from the meeting; somehow it had disappeared. I still thought it prudent for the Endowment to operate on Freishtat's (suddenly absent) conviction that a conflict might exist; if that original view was right, any taint would have major consequences. So I worked out an arrangement with him where he could be present at the middle of the meeting to discuss the Maryland litigation, after Bainton [Olivarius's counsel] had spoken to the Board about the New York litigation. Freishtat and I went over the agenda by phone, but he insisted on getting a written copy. Also to protect him from taint, I said I would send him a *truncated* agenda rather than the real thing plus attachments; he said that this would be a good solution to any possible conflict. I spoke to Joanne about having Freishtat appear later in the meeting, and she approved it. *The resolution firing me makes much of the fact that I did not send him the same agenda I had sent the Board. Now you know why,* and that he approved of my doing so in advance. [Italics added.]

7. Differently put, since Olivarius could have raised her concealment claim during the pendency of the earlier case, her assertion of that claim now to overturn the judgment is barred by res judicata. *See Weldon v. United States*, 70 F.3d 1, 5 (2d Cir.1995).

Olivarius did not know that then, and she was obliged to find out if that was so and to have her claim adjudicated without delay. The arbitrator (or the judge hearing her first motion to vacate) might have found in her favor; indeed, if her claim is true, the Endowment might have turned over the documents after all.

We conclude that Rule 60(b)(3) required Olivarius to bring her fraudulent concealment claim within one year after the Superior Court confirmed the arbitration award in December 1999. Since Olivarius did not seek relief from that judgment until more than a year had elapsed, her motion is barred as untimely.

### III.

We turn to the cross-appeal. The Endowment argues that the trial court erred in denying its motion for sanctions pursuant to Superior Court Civil Rule 11(c) without first holding an evidentiary hearing. Such a hearing became necessary, the Endowment argues, when the court found that the written record alone did not show that Olivarius had falsified the documents on which her motion was based.

■ Whether to hold a hearing on a Rule 11 motion is a matter committed to the discretion of the trial court. *Peddlers Square, Inc. v. Scheuermann,* 766 A.2d 551, 559 (D.C.2001). Evidentiary hearings on Rule 11 motions are by no means favored, and the Endowment does not persuade us that the court abused its discretion in this case. When it moved for sanctions, the Endowment made the deliberate choice not to request an evidentiary hearing, but to rely instead on the force of its affidavits and documentary evidence. Having invited the court to rule on that basis, it cannot now complain that the court actually did so. We are not sympathetic to a hearing request that the Endowment made only after it lost its gam-

ble. Nor will we deprecate the court's expressed reasons for declining to take testimony; serious as the allegations were, it was not unreasonable for the court to decide that an evidentiary hearing would be unproductive given all the evidence it had already considered with care. "In many situations the judge's participation in the proceedings provides him with full knowledge of the relevant facts and little further inquiry will be necessary." *Montgomery v. Jimmy's Tire & Auto Ctr., Inc.,* 566 A.2d 1025, 1031 (D.C. 1989) (quoting Fed.R.Civ.P. 11, Advisory Committee Note, 97 F.R.D. 198, 201 (1982)). We cannot conclude that this is not such a case.

### IV.

In conclusion, we uphold the trial court's rulings. Even if the court did not apply the correct law, it had no choice but to deny Olivarius's motion to set aside the prior judgment confirming the arbitration award, as that motion was untimely and otherwise non-compliant with Superior Court Civil Rule 60(b). And the court did not abuse its discretion in deciding the Endowment's motion for Rule 11 sanctions without holding an evidentiary hearing, given both the untimeliness of the Endowment's request for such a hearing and the ample evidentiary record before the court.

*Affirmed.*